UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

_____
                                                    )
PULLMAN ARMS INC, GUNS and GEAR, LLC,  )
PAPER CITY FIREARMS, LLC,                    )
GRRR! GEAR, INC, and                           )
NATIONAL SHOOTING SPORTS               )
FOUNDATION, INC.                                 )
                                                    )
                                                    )
            Plaintiffs,                           )
                                                    )
v.                                                   )
                                                    )
                                                    )
MAURA HEALEY, ATTORNEY GENERAL       )
FOR THE COMMONWEALTH OF               )
MASSACHUSETTS                                 )
                                                    )
            Defendant.                           )
_____)

**COMPLAINT FOR DECLARATORY RELIEF**

**Introduction**

1.      This is an action for declaratory relief brought by the National Shooting Sports

Foundation and four licensed firearm retailers asking this Court to declare that the July 20, 2016

Enforcement Notice issued by Massachusetts Attorney General Maura Healey to be

unconstitutionally vague, invalid, and unenforceable.  On July 20, 2016, the Attorney General

unexpectedly and without any public notice or input announced that she now intends to enforce a

state criminal firearms licensing statute and G.L. c. 93A, the Massachusetts Consumer Protection

Act, according to entirely new, but unconstitutionally vague interpretations for what constitutes a

banned "assault weapon."  The Attorney General's Office has said it "is expecting full, voluntary

compliance with the Assault Weapons ban, as it is explained in the Enforcement Notice, but will

enforce the Commonwealth's laws in a civil or criminal action if gun dealers or individuals do not comply." <u>See</u> copy of Question and Answers, p. 3, attached as Exhibit A.

2.      Retail firearm stores, including the four named plaintiffs, cannot determine the meaning and scope of the Enforcement Notice and whether certain firearms fall within the newly defined term, assault weapon "copy." Because criminal penalties can result from violations of the licensing statute, the unduly vague Enforcement Notice violates due process protections afforded under the Fifth and Fourteenth Amendments to the United States Constitution. In addition, the 2016 Enforcement Notice issued without any administrative process or input from affected parties, radically redefines the meaning of the statutory phrase "copies and duplicates of assault weapons" in a manner specifically rejected by the Massachusetts Legislature before it amended the state licensing law in 1998. The Enforcement Notice therefore exceeds the Attorney General's lawful authority.

## JURISDICTION

3.      This action arises under the Second, Fifth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983 and 28 U.S.C. §2201. This Court has jurisdiction under 28 U.S.C. §1331 in that this action arises under the Constitution of the United States.

4.      Venue is proper in the District of Massachusetts under 28 U.S.C. §1391.

## PARTIES

5.      Plaintiff, Pullman Arms Inc. is a corporation organized under the laws of the Commonwealth of Massachusetts. Pullman Arms Inc. is licensed to sell firearms in the Commonwealth, and it operates a retail store in Worcester, Massachusetts.

6.     Plaintiff, Guns and Gear, LLC is limited liability company, organized under the laws of the Commonwealth of Massachusetts.  Guns and Gear, LLC is licensed to sell firearms in the Commonwealth of Massachusetts, and it operates a firearm retail store in Agawam, Massachusetts.

7.     Plaintiff, Paper City Firearms, LLC is a limited liability company organized under the laws of the Commonwealth of Massachusetts.  Paper City Firearms, LLC is licensed to sell firearms in the Commonwealth, and it operates a retail store in Holyoke, Massachusetts.

8.     Plaintiff, Grrr! Gear, Inc. is a corporation organized under the laws of the Commonwealth of Massachusetts.  Grrr! Gear, Inc. is licensed to sell firearms in the Commonwealth, and it operates a retail store in Orange, Massachusetts.

9.     Plaintiff, National Shooting Sports Foundation ("NSSF") is a Connecticut, non-stock, not-for-profit corporation having its principal place of business located at 11 Mile Hill Road, Newtown, Connecticut.  NSSF is a 501(c)(6) tax exempt trade association for the firearms, ammunition, hunting, and the shooting sports industry with over 13,000 members that include federally licensed firearms and ammunition manufacturers, wholesale distributors, and firearm retailers.  NSSF has members across the United States, including manufacturers, distributors, and retailers based in Massachusetts.  NSSF's mission is to promote, protect, and preserve hunting sports.  Many NSSF's members import, manufacture, distribute, and sell firearms and had been selling firearms which may be now prohibited under the Enforcement Notice recently issued by the Office of the Attorney General.

10.     Defendant Attorney General Maura Healey ("Attorney General") is the duly elected Attorney General for the Commonwealth of Massachusetts and is named in her official capacity.

11.     The Office of the Attorney General was established pursuant to M.G.L. c. 12 §§1-11N.  The Office of the Attorney General has issued regulations pursuant to its authority under m. G.L. c. 93A.

## FACTS

**Firearm terminology**

12.     Firearms are made up of several distinct sets of parts. The receiver is the basic unit of a firearm which houses the firing and breech mechanisms and to which the barrel and stock are attached.

13.     In a rifle, shotgun, or pistol, the chamber refers to the rearmost part of the barrel formed to accept a specific cartridge or shell when inserted.

14.     A firearm bolt is the mechanical part that blocks the rear of the chamber while the ammunition propellant burns, and then moves out of the way to allow another cartridge to be inserted into the chamber.

15.     A firearm extractor is the device for withdrawing a cartridge or fired case from the chamber of a firearm.

16.     The firearm stock refers to the wood, metal, or composite component to which the metal or composite parts of the firearm are attached to enable the holding of the firearm.

17.     Centerfire ammunition refers to ammunition cartridges where the primer is seated in the center of the case head.  Rimfire ammunition refers to ammunition cartridges where the priming mixture is in the rim of the cartridge cavity.  The most common rimfire caliber is .22 caliber.

**Federal Firearm Laws**

18.     In 1968, Congress enacted the Gun Control Act, 18 U.S.C. §§ 921-930, which sought to impose a comprehensive regulatory scheme on the import, manufacture and sale of firearms.

19.     Congress subsequently amended the Gun Control Act in 1994 when it enacted the Public Safety and Recreational Firearms Use Protection Act.  That act prohibited, for a period of ten years, the manufacture, transfer, or possession of so-called "assault weapons" as defined by the statute.

20.     The Public Safety and Recreational Firearms Use Protection Act was not a broad ban on semi-automatic firearms based on how the firearms operated or functioned or their similarity to other firearms.  Instead, the amendment, sponsored by Senator Dianne Feinstein of California, banned as so-called "assault weapons" a short list of specifically identified semi-automatic firearms and exact "copies and duplicates" of those specifically listed firearms, along with other semiautomatic firearms based on whether they had two or more features.

21.     18 U.S.C. §921(a)(30) defined the term "semiautomatic assault weapon" to include a list of precise models made by specified manufacturers.  It stated as follows:

(30) The term "semiautomatic assault weapon" means (A) any of the firearms, or copies or duplicates of the firearms in any caliber, known as -

(i)      Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);
(ii)     Action Arms Israeli Military Industries UZI and Galil;
(iii)    Beretta Ar70 (SC-70);
(iv)     Colt AR-15;
(v)      Fabrique National FN/FAL, FN/LAR and FNC;
(vi)     SWD M-10, M-11, M-11/9 and M-12;
(vii)    Steyr AUG;
(viii)   INTRATEC TEC-9, TEC-DC9 and TEC-22; and
(ix)      revolving cylinder shotguns, such as, or similar to, the Street Sweeper and Striker 12.

22.     These specific banned "assault weapons" became known as "enumerated" firearms.  In addition to the specific firearms and copies or duplicate of those firearms, the federal legislation also banned as an "assault weapon" any semiautomatic rifle, pistol, or shotgun that failed what became known as the "features" test.  18 U.S.C. §921(a)(30)(B) provided the following clear objective test for rifles:

> (B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—
> (i)      a folding or telescoping stock;
> (ii)     a pistol grip that protrudes conspicuously beneath the action of the weapon;
> (iii)    a bayonet mount;
> (iv)    a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and
> (v)     a grenade launcher.

23.     Similarly, 18 U.S.C. §921(a)(30)(C) included within the definition of assault weapon a semiautomatic pistol that has the ability to accept a detachable magazine and has at least two of the following features:

> (v)      an ammunition magazine that attaches to the pistol outside of the pistol grip;
> (vi)     a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip or silencer;
> (vii)    a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;
> (viii)   a manufactured weight of 50 ounces or more when the pistol is unloaded; and
> (ix)     a semiautomatic version of an automatic firearm.

24.     18 U.S.C. §921(a)(30)(D) included certain semiautomatic shotguns within the definition of assault weapons.  Semiautomatic shotguns that had at least 2 of the following features were also considered assault weapons:

> (x)      a folding or telescoping stock;
> (xi)     a pistol grip that protrudes conspicuously beneath the action of the weapon;
> (xii)    a fixed magazine capacity in excess of 5 rounds; and
> (xiii)   an ability to accept a detachable magazine.

25.     The federal statute exempted certain firearms from the assault weapon ban, including a list of firearms appearing as appendix A to the statute.

26.     The Public Safety and Recreational Firearms Use Protection Act did not contain, and was never interpreted to include, a "similarity" test or "interchangeability" test to define what constitutes an "assault weapon."  The federal statute did not ban other semiautomatic firearms based on a) whether their internal functional components or operating system and firing mechanism was based on or substantially similar to a specifically listed firearm; or b) whether a firearm has a receiver that is the same as, or is interchangeable with the receiver of, a specifically listed firearm or includes or accepts two or more of the same operating components.

27.     This is confirmed through the statute's legislative history as Congress considered the amendment. For example, as the then-pending Feinstein amendment was being considered and debated, Senator Larry Craig of Idaho wrote John Magaw, the Director of the Bureau of Alcohol Tobacco and Firearms ("ATF"), asking if a firearms list attached to his letter would be banned under the Feinstein amendment, which became law. See letter attached as Exhibit B.

28.     In response, Director Magaw wrote Senator Craig and listed five models which would not be assault weapons, including the Commando Arms Carbine, the Feather Saturn 30 Rifle, the F.I.E./Franchi Paracarbine the Heckler Koch VP 70Z Pistol and the Valmet Hunter Rifle.  See response letter attached as Exhibit C. Those firearms all have operating systems based on various enumerated weapons, but they lack the specific features enumerated in the features test.

29.     ATF Director Magaw also noted that the vast majority of semiautomatic firearms on the list would be considered banned firearms. However, ATF Director Magaw stated that those firearms could be modified to remove the assault weapon features such as the bayonet lug

or the flash suppressor, and therefore, remove them from the definition of assault weapon. Nowhere in his response did Director Magaw mention that the term "copies" referred to similar operating systems or interchangeability of components. This exchange of letters appears in the Congressional Record at 140 Cong. Rec. S4939-41 (May 2, 1994), as the federal law was debated. See Congressional record attached as Exhibit D.

30. As the legislation was considered and debated, Senator Joseph Biden of Delaware also made clear that the term "copy" did not refer to the firearm's operating system: it prohibited those specifically named manufacturers from simply renaming the firearm to avoid the legislative ban. He stated: "[t]o avoid the so-called copycat problem – where manufacturers simply rename guns to avoid State assault weapon legislation – the amendment makes clear that replicas and duplicates of the listed firearms are covered as well." Senator Biden stated further that "to make clear that this ban applies only to military style assault weapons, this ban would apply only to semiautomatic rifles and pistols that can accept detachable magazines that have at least two of the following characteristics: A grenade launcher; a flash suppressor; a bayonet mount; a folding stock; or a pistol grip." 139 Cong. Rec. S15459. See copy attached as Exhibit E, p. 20 of 28.

31. By its terms, 18 U.S. C. §921(a)(30) was repealed on September 13, 2004.

**Massachusetts Adopts the Federal Assault Weapon Definitions**

32. Massachusetts regulates the sale of firearms in several means, including requiring licenses for firearms retailers under G.L. c. 140 §§122 and 123 *et seq*. In 1998, Massachusetts enacted amendments to the licensing provisions relating to firearm sales in G.L c. 140.

33. As the Massachusetts Legislature considered amending the statute, one amendment, Senate Bill No. 1985, proposed to define "assault weapon" with thirteen categories

of specific firearms and "copies" of those firearms by including a definition of "copy" based on similar bolt and receiver designs.  Senate Bill No. 1985 defined the term "copy" to include any:

> any weapon model with the same bolt and receiver or bolt and receiver design, regardless of nomenclature or manufacturer, as any weapon designated as an "assault weapon" in this section or with a bolt and receiver design identical or nearly identical, regardless of nomenclature or manufacturer, to any designated weapon which has been redesigned from, renamed, renumbered or patterned after any such designated weapon, regardless of the manufacturer or country of origin; provided, however, that the weapon as modified, enhanced, redesigned, renamed, renumbered, or patterned employs only ammunition of more than .22 caliber rimfire.

See Copy of Senate Bill No.1985 attached as Exhibit F.

34.     The Massachusetts Legislature rejected the proposed "copy" definition which referred to identical or nearly identical bolt and receiver designs.  Instead, the Legislature incorporated the assault weapon ban based on the definitions of assault weapon appearing in 18 U.S.C. §921(a)(30).  The Legislature amended G.L. c. 140 to provide that the term "assault weapon" shall have the same meaning as a semiautomatic weapon defined in 18 U.S.C. §921(a)(30), by including the list of enumerated firearms from 18 U.S.C. §921(a)(30) such as AK models, Israeli made UZIs, and Colt AR-15's, and copies or duplicates of the enumerated weapons, without any reference to identical or nearly identical receivers and bolts.

35.     The Massachusetts Legislature embraced and adopted the "features test" when, in enacting G.L. c. 140 §121, it said that the term "assault weapon" shall have the same meaning as the federal statute.

36.     G.L. c. 140 §131M impose criminal penalties for violations of the assault weapons restrictions in G.L. c. 140 §121.

37.     The Massachusetts Legislature in enacting G.L. c. 140 § 121 did not enact a "similarity" test or "interchangeability" test to define what constitutes an "assault weapon"

because no such tests existed in the federal law.  The "similarity" test and "interchangeability" test did not exist anywhere until July 20, 2016, when it was created for the first time by the Office of the Attorney General.

38.     For over two decades, since 1994 under federal law as enforced by the ATF, and then since 1998 under Massachusetts law, firearms manufacturers, Massachusetts' firearms retailers and law enforcement authorities, including the Executive Office of Public Safety, which has approved and registered all firearm transactions, have universally interpreted G.L. c.140 §121 to mean that only firearms meeting the features test and the specifically enumerated firearms constituted banned assault weapons.

39.     On July 20, 2016, the Attorney General for the Commonwealth of Massachusetts issued an "Enforcement Notice."   The Attorney General did not publish any intent to issue the Enforcement Notice in the Commonwealth Registry.  The Attorney General did not hold any public hearings before the Enforcement Notice issued to receive comments or any input into the terminology used in the Enforcement Notice.  The Attorney General did not follow in any manner the requirements of G.L. c. 30A in issuing what constitutes a regulation in the form of the Enforcement Notice.

40.     The Attorney General's regulations set forth in the Enforcement Notice for the first time ever adopted an entirely new interpretation of the "assault weapon" definition that is not in conformity with the statutory test or the legislative history or intent.

41.     The Enforcement Notice purportedly sought to clarify what was meant by copies or duplicates of the enumerated weapons under Massachusetts law.  See Enforcement Notice attached as Exhibit G.  It stated that:

> A weapon is a Copy or Duplicate and is therefore a prohibited Assault weapon if it meets one or both of the following tests and is 1) a semiautomatic rifle or handgun

that was manufactured or subsequently configured with an ability to accept a detachable magazine, or 2) a semiautomatic shotgun.

1.   *Similarity Test*: A weapon is a Copy or Duplicate if its internal functional components are substantially similar in construction and configuration to those of an Enumerated Weapon. Under this test, a weapon is a Copy or Duplicate, for example, if the operating system and firing mechanism of the weapon are based on or otherwise substantially similar to one of the Enumerated Weapons.

2.   *Interchangeability Test*: A weapon is a Copy or Duplicate if it has a receiver that is the same as or interchangeable with the receiver of an Enumerated Weapon. A receiver will be treated as the same as or interchangeable with the receiver on an Enumerated Weapon if it includes or accepts two or more operating components that are the same as or interchangeable with those of an Enumerated Weapon. Such operating components may include, but are not limited to: 1) the trigger assembly; 2) the bolt carrier or bolt carrier group; 3) the charging handle; 4) the extractor or extractor assembly; or 5) the magazine port.

42.   Not long after issuing the Enforcement Notice, the Office of the Attorney General issued a follow-up notice entitled "Guns That Are Not Assault Weapons" in August, and this notice creates more uncertainty for the firearms retailers. The first version of this notice, which appeared in the form of questions and answers on or about August 18, 2016, listed various firearms models which were stated not to be assault weapons, including handguns appearing on the Executive Office of Public Safety's handgun roster, any .22 caliber rifle, any Ruger Mini 14, any weapon that is operated by a manual bolt, pump, lever or slide action, and antiques and relics, among other exempted firearms.  See attached notice as Exhibit H.

43.   This "Guns That Are Not Assault Weapon" notice, with only a couple of exceptions, simply lists the models exempt from the assault weapon ban as appended to the original federal statute in 18 U.S.C. §921(a)(30) and other exemptions incorporated into M.G.L. c. 140.

44.   Many of the most popular models of semiautomatic rifles manufactured and sold are chambered for 223 Remington caliber centerfire ammunition, which has a bullet diameter of .223 inches.  Under the Attorney General's Enforcement Notice, which misinterprets and

exceeds the statutory definition of an "assault weapon," many of these popular and commonly

owned rifles appear to be banned under one or more of the Attorney General's new tests.

45.     According to the August, 2016 notice issued by the Attorney General, however,

these popular rifle models, which accept 223 Remington caliber ammunition, suddenly appeared

to be legal to manufacture and sell in the Commonwealth because the August notice stated that

"any 22 caliber rifle" did not constitute an assault weapon, nor were they copies or duplicates of

the "enumerated assault weapons."

46.     Within mere days, the "Guns That Are Not Assault Weapons" notice suddenly

changed, without any reason provided, to state that only semiautomatic rifles chambered for .22

caliber rimfire ammunition were not "assault weapons."  See revised Notice as Exhibit I.  This

unannounced change reversed course from the notice issued days earlier and reduced the number

of firearms that could be lawfully sold.

47.     The Office of the Attorney General changed course again after it revised the

"Guns That Are Not Assault Weapons" notice and added .17 caliber rimfire ammunition models

as firearms which are not banned "assault weapons."  See Exhibit A, p. 2.

48.     The second notice entitled "Guns that Are Not Assault Weapons" also suddenly

listed "[a]ny Springfield Armory M1A or substantially similar model weapon" as firearms which

are not banned assault weapons.  See Exhibit I.

49.     The Springfield Armory M1A evolved into the MK 14 EBR, which is essentially

an M1A in an aluminum chassis.  The MK 14 EBR is in active use by the United States military

special forces and according to the second "Guns That Are Not Assault Weapons" notice, it does

not appear to be an assault weapon because it is "substantially similar" to an M1A. Neither the

former federal law nor G.L. c. 140 contain any such "substantially similar" test, and the

regulations promulgated by the Attorney General are unconstitutionally vague whether as a means to include or exclude firearms from the scope of the law.

50.     The language appearing in the Enforcement Notice is too vague for retailers, distributors, and manufacturers to understand because it does not adequately define what it means by the phrase contained in the new regulation "operating system and firing mechanism of the weapon are based on or otherwise substantially similar to one of the enumerated weapons."

51.     The enumerated firearms employ similar, basic operating technologies used in most semiautomatic firearms manufactured today including what is known as gas impingement, gas piston, and blow back.  Even if the parts utilized in their systems are different, to many firearm engineers and designers, most gas impingement systems are similar to each other; most gas piston systems are similar to each other; and most blow back systems are similar to each other, at least in terms of the physics principles utilized in their design.

52.     As a result, although undefined, if the phrase "substantially similar" refers to commonality in physics principles, then virtually all semiautomatic firearms are substantially similar to the enumerated weapons. In that event, the Enforcement Notice effectively bans all semi-automatic firearms with the exception of the listed exempt weapons.

53.     If the Attorney General's Enforcement Notice is broadly interpreted, it applies to all semiautomatic firearms. If that is a correct reading of the regulations, they violate the Second and Fourteenth Amendments to the United States Constitution to keep and bear arms because it bans the manufacture, sale, and possession of a broad universe of rifles, pistols, and shotguns that are commonly owned and used by citizens of Massachusetts for lawful purposes including self-defense in the home.

13

54.     However, the phrase "operating system and firing mechanism" being "based on" or "substantially similar" to the enumerated weapons could also refer to commonality of design details. If that is the interpretation of the Enforcement Notice intended by the Office of the Attorney General, only firearms designs which have interchangeable parts while maintaining functionality would be substantially similar to each other.

55.     The vague terms create confusion for the regulated retailers concerning what firearms may be lawfully sold by them. For example, the modern bullpup IWI Tavor and the FN PS90 are rifle models that can be sold without a threaded muzzle or flash suppressor and do not meet the criteria of being an assault weapon under the interchangeability test.

56.     A bullpup firearm has its receiver/action located behind the trigger group. Bullpup firearms tend to house the receiver/action in the butt of the stock, effectively shortening the overall length of the firearm.

57.     The IWI Tavor's bullpup design and the FN PS90's operating systems are not substantially similar to other enumerated weapons in their design details and interchangeability of parts.  It is uncertain, though, if these firearm models should be classified as a "copy" of the enumerated weapons under the substantially similar test if that test is broadly interpreted to include commonality in physics principles.

58.     A carbine is a rifle with a 16 inch barrel.

59.     There are several versions of pistol caliber carbines including but not limited to the Beretta CX4 Storm and the Kel-Tech Sub 2000 that would not meet the interchangeability test under the Enforcement Notice.  However, if the substantially similar test is broadly construed to include physics principles rather than design details, these models may also be deemed to be unlawful, banned assault weapons.

14

60.     The subsequently issued notices have added to the uncertainties facing retailers when deciding what firearms they may lawfully sell. One "Questions & Answers" notice, appearing at Exhibit H, states on page 1 that the Enforcement Notice controls in the event of any discrepancies between it and the Questions & Answers.  These notices create confusion because there are a large number of models of .22 caliber rimfire semiautomatic rifles manufactured and sold by many manufacturers, including the Nordic NC-22LR, the CMMG MK4 T 22LR, a Smith and Wesson M&P 15-22, the DPMS Bull Barrel 22 LR and the DPMS AP4 22 LR.  Although these would be prohibited under the new definition of "copy" appearing in the Enforcement Notice, which bans copies of any caliber, the later issued "Guns That Are Not Assault Weapons" notice states that they are not banned.

61.     Simply put, the Office of the Attorney General is making ad hoc decisions untethered to the statute that constrains her lawful authority.

62.     Retailers also face uncertainties with firearms such as the MK 14 EBR which appear to be allowed under the subsequently issued "Guns that Are Not Assault Weapons" notice.  That firearm would not pass the substantially similar or interchangeability tests issued under the Enforcement Notice.

63.     The Attorney General's Office does not even know exactly what the Enforcement Notice means. After the Office of the Attorney General issued the Enforcement Notice, Christine Noyes from Grrr! Gear, Inc. contacted the Attorney General's Office at the telephone number provided on the Office's announcement to receive guidance on whether certain Ruger firearms constituted "copies" of assault weapons and would be prohibited. After speaking to the person at the office, the Attorney General's office informed her that they did not know the answer, and they did not have a list of what would be prohibited assault weapons.  Instead, the Office also

informed Ms. Noyes that her store should use "its best judgment" in deciding which firearms fell under the term "copies or duplicates."

64.     Representatives from Pullman Arms also contacted the Attorney General's office to ask questions concerning the scope of the Enforcement Notice, and they were also told to use their best judgment.

65.      Guns and Gear, LLC has sold IWI Tavor model rifles in the past but does not sell them now out of fear of being prosecuted.

66.     Paper City Firearms, LLC has sold .22 caliber rimfire AR-15 style rifles in the past but does not sell them now out of fear of being prosecuted.

67.     Grrr! Gear, Inc. has sold Smith and Wesson M&P 15-22 rifles in the past, but does not sell them now out of fear of being prosecuted.

68.     Pullman Arms Inc., has sold IWI Tavor model rifles, Smith and Wesson M&P 15-22 rifles, and the FN PS90 rifles in the past but does not now sell them now out of fear of being prosecuted.

69.     Since issuing the Enforcement Notice, the Attorney General has stated that she intends to enforce what she has declared to be the new interpretation of what constitutes banned assault weapons.  For example, when the Enforcement Notice issued, the Office of the Attorney General issued a press release stating that "A.G. Healey continues to investigate violations of the gun law statewide." See attached notice as Exhibit J.  In an op-ed piece published by the Boston Globe, Attorney General Healey stated that "If Washington won't use its power to get these guns off our streets, we will."  See attached Op-Ed article attached as Exhibit K. In her announcement remarks issued with the Enforcement Notice, Attorney General Healey stated "[t]oday, we've put

gun manufacturers and gun dealers on notice that we're cracking down on the illegal sale of assault weapons in Massachusetts." See attached Remarks as Exhibit L.

**COUNT ONE**
**DECLARATORY JUDGMENT (28 U.S.C. § 2201)**

70.     The Plaintiffs restate the allegations contained in paragraphs 1 to 69 as if fully set forth herein.

71.     The Plaintiffs are all persons entitled to protection under the Fourteenth Amendment.

72.     The Office of the Attorney General's Enforcement Notice is in violation of and contrary to the protections afforded persons under the Due Process Clause in the Fourteenth Amendment to the United States Constitution.

73.     The Enforcement Notice's definition of "copy" and "duplicate," which includes weapons "substantially similar in construction and configuration to those of an Enumerated Weapon. Under this test, a weapon is a Copy or Duplicate if the operating system and firing mechanism of the weapon are based on or otherwise substantially similar to one of the Enumerated Weapons," is too vague for a reasonable person to apply to know which firearms are banned, including but not limited to the IWI Tavor, the pistol carbines, the 22 caliber rimfire models that are based on the AR-15, and other firearms.

74.      The Attorney General's Enforcement Notice and new interpretation based on similarity of operating systems and interchangeable receivers and components is contrary to the federal and state statutes' definitions of assault weapons as determined by the statutes' legislative history.  As a result, any effort to redefine copy or duplicate in the manner of the Enforcement Notice exceeds the Attorney General's statutory authority.  The Attorney General's Enforcement

Notice is also arbitrary and capricious and an abuse of discretion or is not otherwise in accordance with law.

75.     The Enforcement Notice's definition of copy or duplicate as referring to interchangeable receivers and operating components is too vague for retailers to understand and conform their conduct to the law.

76.     The Enforcement Notice and the subsequent efforts to clarify its scope, including its statements concerning .22 caliber firearms and M1A model rifles are too vague for retailers to understand and to conform their conduct to the law.

77.     If the Attorney General's Enforcement Notice is read and understood as applying to all semiautomatic firearms, it violates the Second and Fourteenth Amendments to the United States Constitution to keep and bear arms because it bans the manufacture, sale, and possession of a broad universe of rifles, pistols, and shotguns that are commonly used by citizens of Massachusetts.

78.     The legality of the Attorney General's Enforcement Notice constitutes a question of law.

79.     There is an actual dispute between the parties over whether the Enforcement Notice issued by the Attorney General is proper under the Fifth and Fourteenth Amendments and under the statutory authority granted her by the Legislature.  As a result, declaratory relief is appropriate under 28 U.S.C. § 2201.

80.     There is an actual dispute between the parties over whether the Enforcement Notice issued by the Attorney General is proper under the Second and Fourteenth Amendments and under the statutory authority granted her by the Legislature.  As a result, declaratory relief is appropriate under 28 U.S.C. § 2201.

## COUNT TWO
## DECLARATORY JUDGMENT (42 U.S.C. §1983)

81.    The Plaintiffs restate the allegations contained in paragraphs 1 to 80 as if fully set forth herein.

82.    The Plaintiffs are all persons entitled to protection under the Fourteenth Amendment.

83.    The Office of the Attorney General's Enforcement Notice is in violation of and contrary to the protections afforded persons under the Due Process Clause in the Fourteenth Amendment to the United States Constitution.

84.    The Enforcement Notice's definition of "copy" and "duplicate," which includes weapons "substantially similar in construction and configuration to those of an Enumerated Weapon. Under this test, a weapon is a Copy or Duplicate if the operating system and firing mechanism of the weapon are based on or otherwise substantially similar to one of the Enumerated Weapons," is too vague for a reasonable person to apply to know which firearms are banned, including but not limited to the IWI Tavor, the pistol carbines, the 22 caliber rimfire models that are based on the AR-15, and other firearms.

85.    The Attorney General's Enforcement Notice and new interpretation based on similarity of operating systems and interchangeable receivers and components is contrary to the federal and state statutes definitions of assault weapons as determined by the statute's legislative history.  As a result, any effort to redefine copy or duplicate in the manner of the Enforcement Notice exceeds the Attorney General's statutory authority.  The Attorney General's Enforcement Notice is also arbitrary and capricious, an abuse of discretion or is not otherwise in accordance with law.

86.     The Enforcement Notice's definition of copy or duplicate of an assault weapon based on interchangeable receivers and operating components is too vague for retailers to understand and conform their conduct to the law.

87.     The Enforcement Notice and the subsequent efforts to clarify its scope including its statements concerning .22 caliber ammunition firearms and M1A model rifles are too vague for retailers to understand and to conform their conduct to the law.

88.     If the Attorney General's Enforcement Notice is read and understood as applying to all semiautomatic firearms, it violates the Second and Fourteenth Amendments to the United States Constitution to keep and bear arms because it bans the manufacture, sale and possession of a broad universe of rifles, pistols, and shotguns that are commonly used by citizens of Massachusetts.

89.     The legality of the Attorney General's Enforcement Notice constitutes a question of law.

90.     There is an actual dispute between the parties over whether the Enforcement Notice issued by the Attorney General is proper under the Fifth and Fourteenth Amendments and under the statutory authority granted her by the Legislature.  As a result, declaratory relief is appropriate under 42 U.S. C. §1983.

91.     There is an actual dispute between the parties over whether the Enforcement Notice issued by the Attorney General is proper under the Second and Fourteenth Amendments and under the statutory authority granted her by the Legislature.  As a result, declaratory relief is appropriate under 28 U.S.C. §1983.

## <u>REQUESTS FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

1.      After a hearing on the merits, issue a judgment in favor of the Plaintiffs, declaring that the Attorney General's Enforcement Notice dated July 20, 2016 is unconstitutionally vague both on its face and as applied.

2.      After a hearing on the merits, issue a judgment in favor of the Plaintiffs declaring that the Attorney General's Enforcement Notice exceeds her authority in that G. L. c. 140, by incorporating the definitions formerly appearing in 18 U.S.C. §921(a)(30), does not ban assault weapons based on their internal operating systems or interchangeable receiver parts.

3.      In the alternative, after a hearing on the merits issue judgment in favor of the Plaintiffs declaring that the Enforcement Notice effectively bans all semiautomatic firearms and violates the Second and Fourteenth Amendments to the United States Constitution.

4.      After a hearing on the merits, issue a permanent injunction enjoining the Office of the Attorney General from enforcing the Enforcement Notice and its definition of copy or duplicate of Enumerated Weapons as issued on July 20, 2016.

5.      Enter such further relief as this Court deems just and proper.

6.      Award the Plaintiffs their reasonable attorney fees and costs in bringing this

action.

PLAINTIFFS,
Pullman Arms Inc., Guns and Gear, LLC,
Paper City Firearms, LLC, Grrr! Gear, Inc.,
and National Shooting Sports Foundation,
Inc.
By their attorneys,


    /s/  David R. Kerrigan
Christopher A. Kenney, Esq., BBO# 556511
cakenney@KandSlegal.com
David R. Kerrigan, Esq., BBO# 550843
drkerrigan@KandSlegal.com
Kenney & Sams, P.C.
Old City Hall
45 School Street
Boston, MA 02108
(617)722-6045


    /s/   Michael J. Sullivan
Michael J. Sullivan, Esq.
msullivan@ashcroftlawfirm.com
Ashcroft Law Firm
200 State Street
7th Floor
Boston, MA 02109

DATED: September 22, 2016