UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

PULLMAN ARMS INC.; GUNS and GEAR, LLC;
PAPER CITY FIREARMS, LLC; GRRR! GEAR,
INC.; and NATIONAL SHOOTING SPORTS
FOUNDATION, INC.,

               Plaintiffs,

          v.

MAURA HEALEY, ATTORNEY GENERAL FOR
THE COMMONWEALTH OF
MASSACHUSETTS,

               Defendant.

---

CIVIL ACTION NO.
4:16-cv-40136-TJH

 

## MEMORANDUM OF ATTORNEY GENERAL MAURA HEALEY
## IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

MAURA HEALEY
ATTORNEY GENERAL


William Porter, BBO #542207
Gary Klein, BBO #560769
Julia Kobick, BBO #680194
Thomas Bocian, BBO #678307
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108
(617) 963-2976

Date: January 10, 2017

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................ 2

   I.  The 1994 Federal Assault Weapons Ban .......................................... 2

   II.  The 1998 Massachusetts Assault Weapons Ban ................................. 5

   III. The 2004 Reauthorization of Massachusetts Assault Weapons Ban ................... 6

   IV. The Attorney General's 2016 Enforcement Notice on Assault Weapons ........... 7

   V.  Allegations in the Complaint. ................................................... 9

ARGUMENT ............................................................................... 10

   I.  This Court Lacks Jurisdiction to Adjudicate
      the Plaintiffs' State-Law Claims ................................................. 10

      A.  All of the Plaintiffs' State-Law Claims Are Barred by the
         Eleventh Amendment ....................................................... 11

      B.  Even If the Plaintiffs' State-Law Claims Were Not Barred
         by the Eleventh Amendment, They Would Fail
         as a Matter of Law ......................................................... 13

           1.  The Enforcement Notice Was Issued in Accordance with
              the Attorney General's Authority as the Chief Law
              Enforcement Officer of the Commonwealth ....................... 13

           2.  The Enforcement Notice is Consistent with the Plain Text,
              Statutory Purpose, and Legislative History of the
              Massachusetts Assault Weapons Ban ............................ 17

                a.  The Enforcement Notice Is Consistent with the
                   Plain Text of the Statute ................................. 18

                b.  The Enforcement Notice Honors the Intent
                   of the Legislature ...................................... 21

                c.  The Enforcement Notice Is Consistent with
                   Legislative History ..................................... 22

       d.  The Enforcement Notice Is Consistent with
          Maryland's Guidance ..........................................................................25

    3.  The Enforcement Notice is Not Arbitrary, Capricious,
       or an Abuse of Discretion ...............................................................25

II.  The Plaintiffs' Vagueness Claim Is Not Cognizable and
Fails as a Matter of Law.................................................................................26

  A.  As a Facial Challenge to the Enforcement Notice,
     the Vagueness Claim Necessarily Rests on Speculation and
     Is Therefore Not Cognizable.......................................................................27

  B.  Even If the Plaintiffs Could Assert a Facial Vagueness Claim,
     It Would Fail Because the Enforcement Notice is Not Vague
     in All of its Applications and Has a Plainly Legitimate
     Sweep ..........................................................................................................30

III.  The Plaintiffs' Contingent Second Amendment Claim Must be Dismissed....................34

  A.  The Second Amendment Claim Does Not Present a Justiciable Case or
     Controversy Because It Is Based on a Hypothetical and Incorrect
     Reading of the Enforcement Notice..........................................................35

  B.  The Enforcement Notice Does Not Implicate the Second Amendment
     Because It Imposes, at Most, a *De Minimis* Burden on
     the Right to Possess a Firearm in the Home for Self-Defense....................37

CONCLUSION.....................................................................................................40

# TABLE OF AUTHORITIES

<u>Cases</u>

*81 Spooner Rd. LLC v. Town of Brookline,*
    452 Mass. 109 (2008) .................................................................................18

*Archie v. City of Racine,*
    847 F.2d 1211 (7th Cir. 1988) (en banc) ......................................................12

*Boston Police Patrolmen's Ass'n, Inc. v. City of Boston,*
    435 Mass. 718 (2002) ............................................................................18, 20

*Champigny v. Commonwealth,*
    422 Mass. 249 (1996) .................................................................................22

*Chapman v. United States,*
    500 U.S. 453 (1991)....................................................................................30

*City of Fall River v. F.E.R.C.,*
    507 F.3d 1 (1st Cir. 2007)...........................................................................36

*Clapper v. Amnesty International USA,*
    133 S. Ct. 1138 (2013)................................................................................36

*Commonwealth v. Bradley,*
    466 Mass. 551 (2013) ...................................................................................3n

*Commonwealth v. Campbell,*
    415 Mass. 697 (1993) .................................................................................17

*Commonwealth v. Cintolo,*
    415 Mass. 358 (1993) .................................................................................14

*Commonwealth v. Clint C.,*
    430 Mass. 219 (1999) .....................................................................13, 14, 17

*Commonwealth v. Kozlowsky,*
    238 Mass. 379 (1921) .................................................................................13

*Commonwealth v. Magnus M.,*
    461 Mass. 459 (2012) .................................................................................18

*Commonwealth v. McGowan,*
    464 Mass. 232 (2013) .................................................................................38

*Commonwealth v. O'Keefe,*
    48 Mass. App. Ct. 566 (2000) ........................................................................19

*Commonwealth v. Pellegrini,*
    414 Mass. 402 (1993) ...................................................................................14

*Commonwealth v. Pon,*
    469 Mass. 296 (2014) ...................................................................................3n

*Commonwealth v. Richards,*
    426 Mass. 689 (1998) ...................................................................................14

*Commonwealth v. Twitchell,*
    416 Mass. 114 (1993) ...................................................................................14

*Country Vintner of N. Carolina, LLC v. E. & J. Gallo Winery, Inc.,*
    718 F.3d 249 (4th Cir. 2013) ........................................................................18

*Crandon v. United States,*
    494 U.S. 152 (1990) .....................................................................................14n

*Cutting v. Portland,*
    802 F.3d 79 (1st Cir. 2015) ...........................................................................30

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) .......................................................................................36

*Depianti v. Jan-Pro Franchising Int'l, Inc.,*
    465 Mass. 607 (2013) ...................................................................................16n

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ........................................................................35, 38, 39

*Draper v. Healey,*
    827 F.3d 1 (1st Cir. 2016) .......................................................................30, 33

*Edelman v. Jordan,*
    415 U.S. 651 (1974) .......................................................................................11

*El Dia, Inc. v. Hernandez Colon,*
    963 F.2d 488 (1st Cir. 1992) .........................................................................36

*Ex parte Young*, 209 U.S. 123 (1908) ................................................................12

*Friedman v. City of Highland Park,*
    784 F.3d 406 (7th Cir. 2015) .........................................................................39

iv

*Giragosian v. Ryan*,
    547 F.3d 59 (1st Cir. 2008)...............................................................3n

*Grayned v. City of Rockland*,
    408 U.S. 104 (1972)...................................................................32, 33

*Gun Owners' Action League v. Swift*,
    284 F.3d 198 (1st Cir. 2002).....................................................28, 32n

*Halebian v. Berv*,
    457 Mass. 620 (2010) ................................................................18, 19

*Heller v. District of Columbia*,
    801 F.3d 264 (D.C. Cir. 2015) .........................................................38

*Hill v. Colorado*,
    530 U.S. 703 (2000).........................................................................32

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .............................................................................29

*John Doe No. 1. v. Reed*,
    561 U.S. 186 (2010)..............................................................27, 28, 29

*Kachalsky v. Cty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012)...............................................................38

*Kerin v. Titeflex Corp.*,
    770 F.3d 976 (1st Cir. 2009) ............................................................36

*Kolbe v. Hogan*,
    813 F.3d 160 (4th Cir. 2016) .....................................................16, 25

*LaShawn A. by Moore v. Barry*,
    144 F.3d 847 (D.C. Cir. 1998) .........................................................12

*Lopez v. Massachusetts*,
    588 F.3d 69 (1st Cir. 2009) ..............................................................12

*Love v. Butler*,
    952 F.2d 10 (1st Cir. 1991)..............................................................30

*Lujan v. Defenders of Wildlife*,
    554 U.S. 555 (1992)..........................................................................36

*Martins v. 3PD, Inc.*,
  No. 11–cv–11313-DPW, 2013 WL 1320454
  (D. Mass. Mar. 28, 2013).......................................................................................16

*Maysonet-Robles v. Cabrero*,
  323 F.3d 43 (1st Cir. 2003)....................................................................................11

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)...............................................................................................38

*McGuire v. Reilly*,
  386 F.3d 45 (1st Cir. 2004)....................................................................................28

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015)...................................................................................38

*Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgmt. Bd.*,
  421 Mass. 196 (1995) ............................................................................................19

*O'Brien v. Mass. Bay Transp. Auth.*,
  162 F.3d 40 (1st Cir. 1998)....................................................................................12

*Pennhurst State School & Hosp. v. Halderman*,
  465 U.S. 89 (1984)...........................................................................................11, 12

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
  674 F.3d 158 (3d Cir. 2012)...................................................................................18

*Richmond Boro Gun Club, Inc. v. City of New York*,
  97 F.3d 681 (2d Cir. 1996).....................................................................................32

*Rosie D. v. Swift*,
  310 F.3d 230 (1st Cir. 2002)..................................................................................11n

*Sabri v. United States*,
  541 U.S. 600 (2004)...............................................................................................29

*Shepard v. Attorney General*,
  409 Mass. 398 (1991) ............................................................................................13

*Showtime Entertainment, LLC v. Town of Mendon*,
  769 F.3d 61 (1st Cir. 2014)...............................................................................27, 29

*Texas v. United States*,
  523 U.S. 296 (1998)...............................................................................................36

*Town of Burlington v. Dist. Att'y for the N. Dist.*,
    381 Mass. 717 (1980) ...............................................................................................13

*United States v. Ansaldi*,
    372 F.3d 118 (2d Cir. 2004)....................................................................................33

*United States v. DeCastro*,
    682 F.3d 160 (2d Cir. 2012)....................................................................................38

*United States v. Fisher*,
    289 F.3d 1329 (11th Cir. 2002) ..............................................................................33

*United States v. Lachman*,
    387 F.3d 42 (1st Cir. 2004).....................................................................................33

*United States v. Mazurie*,
    419 U.S. 544 (1975).................................................................................................30

*United States v. Orchard*,
    332 F.3d 1133 (8th Cir. 2003) ................................................................................33

*United States v. Posters N Things Ltd.*,
    969 F.2d 652 (8th Cir. 1992) ..................................................................................34

*United States v. Salerno*,
    481 U.S. 739 (1987).................................................................................................31

*United States v. Sun and Sand Imports, Ltd., Inc.*,
    725 F.2d 184 (2d Cir. 1984)....................................................................................34

*United States v. Turcotte*,
    405 F.3d 515 (7th Cir. 2004) ..................................................................................33

*United States v. Williams*,
    553 U.S. 285 (2008).................................................................................................30

*United States v. Zhen Zhou Wu*,
    711 F.3d 1 (1st Cir. 2013).......................................................................................29

*URI Student Senate v. Town of Narragansett*,
    631 F.3d 1 (1st Cir. 2011).......................................................................................33

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982).................................................................................................30

*Villanueva v. United States*,
    662 F.3d 124 (1st Cir. 2011) .........................................................................12

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ......................................................................................31

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008) ..................................................................................29, 31

*Will v. Mich. Dept. of State Police*,
    491 U.S. 58 (1989) ........................................................................................11

## **Statutes**

G.L. c. 7, § 53 .............................................................................................................33

G.L. c. 7, § 54 .............................................................................................................33

G.L. c. 12, § 10 ...........................................................................................................13

G.L. c. 17, § 13 ...........................................................................................................34

G.L. c. 30A ...........................................................................................................16, 25

G.L. c. 30A, § 1(1) ......................................................................................................26

G.L. c. 30A, § 14 .........................................................................................................25

G.L. c. 30A, § 14(1) ....................................................................................................25

G.L. c. 30A, § 14(7) ....................................................................................................25

G.L. c. 93, § 82 ...........................................................................................................33

G.L. c. 93A, § 2(c) ................................................................................................. 16-17

G.L. c. 94C, § 1 ...........................................................................................................33

G.L. c. 119, § 54 .........................................................................................................14

G.L. c. 140 .............................................................................................................35, 37

G.L. c. 140, § 121 ............................................................................................... *passim*

G.L. c. 140, § 123 .........................................................................................................5

G.L. c. 140, § 128 ........................................................................................5

G.L. c. 140, § 131M ..........................................................................5, 17, 37n

G.L. c. 159, § 18 ........................................................................................34

G.L. c. 209D, § 1–101 ................................................................................33

G.L. c. 209D, § 2–205 ................................................................................33

G.L. c. 265, § 1 ..........................................................................................14

G.L. c. 265, § 15A ......................................................................................14

G.L. c. 265, § 43 ........................................................................................14

Mass. St. 1998, c. 180

    § 8 ................................................................................................5, 7

    § 19 ...............................................................................................5

    § 23 ...............................................................................................5

    § 47 .............................................................................................5, 7

Mass. St. 2004, c. 150, § 1 ............................................................................7

Pub. L. No. 103–322, 108 Stat. 1796 ..............................................................3

    § 110102(a) ...............................................................................4, 37n

    § 110102(b) ...............................................................................3, 4

    § 110105(2) ..................................................................................7

18 U.S.C. § 921(a)(3) (1994) ..........................................................................4

18 U.S.C. § 921(a)(30) ...............................................................................5, 17

18 U.S.C. § 921(a)(30)(A) (1994) ...............................................................4n, 20

18 U.S.C. § 922 ........................................................................................37n

18 U.S.C. § 922(v) (1994) ..............................................................................4

## Constitutional Provisions

U.S. Const. Amend. I ......................................................................................27, 29, 30

U.S. Const. Amend. II..............................................2, 10, 34, 35, 36, 37, 38, 39

U.S. Const. Amend. XI .................................................2, 10, 11, 12, 13, 17, 25

U.S. Const. Amend. XIV ...............................................................................10, 26

Mass. Const., Decl. of Rights, Art. 30 ...............................................................13

## Rules and Regulations

27 C.F.R. § 478.11 ..............................................................................................9n

38 C.F.R. § 14.560...........................................................................................14n

## Miscellaneous

95 Md. Op. Atty. Gen. 101, 2010 WL 2351491 (2010) ..............................16, 25

139 Cong. Rec. S15411–01, 1993 WL 467078 (Nov. 2, 1993).........................24

139 Cong. Rec. S15475–01, 1993 WL 467099 (Nov. 9, 1993).........................24

140 Cong. Rec. E887–03, 1994 WL 181496 (May 5, 1994) ..........................23n

140 Cong. Rec. H3063–05, 1994 WL 170996 (May 5, 1994)........................23n

140 Cong. Rec. H7934–01, 1994 WL 422560 (Aug. 4, 1994) .......................23n

140 Cong. Rec. H8968–01, 1994 WL 461399 (Aug. 21, 1994) ......................23

140 Cong. Rec. S1793–01, 1994 WL 56153 (Feb. 24, 1994)..........................23

140 Cong. Rec. S4388–01, 1994 WL 137546 (May 5, 1994) ..........................23

140 Cong. Rec. S9998–02, 1994 WL 393151 (July 28, 1994).......................23n

140 Cong. Rec. S12137–02, 1994 WL 449789 (Aug. 19, 1994)....................23n

140 Cong. Rec. S12242–01, 1994 WL 455043 (Aug. 22, 1994)....................23n

140 Cong. Rec. S12399–03, 1994 WL 460054 (Aug. 24, 1994).......................23

150 Cong. Rec. S1901–04, 2004 WL 372453 (Mar. 1, 2004) ...........................................................4

1981–82 Mass. Op. Att'y Gen. No. 9, 1982 WL 188378 (Feb. 11, 1982) ....................................16

1989–90 Mass. Op. Att'y Gen. No. 4, 1990 WL 508739 (Jan. 19, 1990) ....................................16

H.R. Rep. No. 103–489 ...................................................................................................................3

A. Lambiaso, *Romney Signs Assault Weapons Ban Extension, Changes in
Gun Licensing*, State House News Service (July 1, 2004) ..................................7

An Advisory from the Attorney General's Fair Labor Division on M.G.L.
c. 149, s. 148B, Advisory 2008/1 ..............................................................15, 16n

An Advisory from the Attorney General's Fair Labor Division on An Act
Providing Employees Leave for Certain Family Obligations,
Advisory 1998/1 .......................................................................................15, 16

*Concise Oxford English Dictionary* (12th ed. 2011) ..................................................................18

*Jacques, Birmingham Announce Final Enactment of Assault Weapons Bill*,
State House News Service (July 20, 1998) ..........................................................5n

*Jacques Confident Assault Weapons Ban Will Pass Next Session*,
State House News Service (Dec. 3, 1996) .............................................................6

Office of the New Jersey Attorney General, *Clarification of the "Graves
Act" 2008 Directive with Respect to Offenses Committed by Out-
of-State Visitors From States Where Their Gun-Possession
Conduct Would Have Been Lawful* (Sept. 14, 2014) .....................................16n

Senate Copy,
State House News Service (July 16, 1998) ...........................................................6

Senate Session,
State House News Service (May 27, 2004) .........................................................7

U.S. Dept. of Justice, *Guidance Regarding Marijuana Enforcement* (Aug.
29, 2013) ...........................................................................................................16n

*Webster's II New College Dictionary* (1995) ............................................................................18

## INTRODUCTION

Seeking to reduce deaths and injuries caused by military-style semiautomatic weapons, the Massachusetts Legislature in 1998 enacted a ban on the sale and possession of assault weapons in the Commonwealth. These weapons, designed to inflict more severe wounds in more victims than other semiautomatic weapons, have been the weapons of choice in mass shootings and shootings targeting police officers. To keep these weapons out of Massachusetts communities, the Legislature employed two strategies: First, it banned a list of enumerated weapons and any "copies or duplicates" of those weapons. Second, it banned any semiautomatic weapons that accept detachable magazines and have two or more combat-style features.

Our country has witnessed an appalling increase in the number of mass shootings committed with assault weapons in the last decade. The carnage inflicted by these weapons has been horrific—26 children and teachers murdered in Newtown, Connecticut; 12 moviegoers in Aurora, Colorado; 14 county employees at a holiday party in San Bernardino, California; 49 patrons of the Pulse nightclub in Orlando, Florida; 3 police officers in Baton Rouge, Louisiana; and so many more. In the aftermath of those events, Attorney General Maura Healey set out to determine whether assault weapons posed an ongoing risk to the Commonwealth. Her office learned that, in 2015 alone, Massachusetts gun dealers sold more than 10,000 weapons that were nearly identical in design and function to banned enumerated weapons. These weapons were copycats of banned assault weapons like the Colt AR-15 and the AK-47, but gun manufacturers and dealers had made minor modifications to them and claimed, incorrectly, that they were therefore compliant with the Assault Weapons Ban.

To address this problem, the Attorney General, acting in her capacity as chief law enforcement officer of the Commonwealth, issued an advisory, titled an Enforcement Notice, that

1

clarified which weapons are "copies or duplicates" of the banned enumerated weapons. Rather than simply begin prosecuting gun dealers for the sale of these copycat weapons, the Attorney General wished to notify the community as to how she interpreted the phrase "copies or duplicates" and to encourage voluntary compliance with the statute.

The plaintiffs have filed this lawsuit to challenge the Enforcement Notice. They contend that the Notice is inconsistent with Massachusetts law, is unconstitutionally vague, and could be read in a way that violates the Second Amendment. All of these claims must be dismissed. This Court has no jurisdiction to adjudicate the state-law claims because the Eleventh Amendment bars state-law claims against state officials in federal court. In any event, the Notice is wholly consistent with state law because it was issued in accordance with the Attorney General's authority to interpret the criminal laws she is bound to enforce; it is consistent with the plain meaning, purpose, and legislative history of the state Assault Weapons Ban; and it is not arbitrary or capricious. The vagueness claim fails because, as a facial, pre-enforcement challenge to the Notice resting only on speculation, it is not cognizable. The vagueness claim would also fail on the merits because the Notice uses commonly employed terms that can be applied without difficulty. The Second Amendment claim likewise must be dismissed because it is contingent on a hypothetical (and erroneous) reading of the Notice, and therefore does not present a justiciable controversy. And, in any event, the Notice imposes no significant burden on the rights of law-abiding individuals to possess a firearm for self-defense in the home.

## BACKGROUND

### I.   The 1994 Federal Assault Weapons Ban.

In the early 1990s, Congress and the country became increasingly alarmed by the proliferation of a new species of assault weapons being marketed and sold to civilians. Nearly

identical to Russian Avtomat Kalashnikov ("AK") 47s, American M16s, and other automatic military weapons, these semiautomatic weapons had enhanced "capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." H.R. Rep. No. 103–489, at 19–20 (attached as Deft's Ex. A).[1] Congress found that "semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder." *Id.* at 13. The Director of the Bureau of Alcohol, Tobacco and Firearms ("ATF") testified that police officers and the public faced a "rising level of lethality" from assault weapons that was disproportionate to their numbers: Although 1% of firearms in circulation were semiautomatic assault weapons, by 1993 they accounted for 8.1% of the firearms traced to crime. *Id.* Congress found that "[p]ublic concern about semiautomatic assault weapons has grown because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered." *Id.* at 14.

The bill Congress enacted—the "Public Safety and Recreational Firearms Use Protection Act" of 1994, or the 1994 Federal Assault Weapons Ban—"combine[d] two approaches which ha[d] been followed in the past in legislation proposed to control semiautomatic assault weapons—the so-called 'list' approach and the 'characteristics' approach." *Id.* at 20. The first approach was a list of Enumerated Weapons; the law banned the manufacture, transfer, and possession of 19 specific models or variations of semiautomatic weapons, "or copies or duplicates of th[os]e firearms in any caliber." Pub. L. No. 103–322, § 110102(b); 108 Stat. 1796, 1996–98; codified at

---

[1] In ruling on a motion to dismiss, this Court may consider "matters of public record," including legislative history and agency advisory documents. *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008). All of the exhibits attached to this motion fall into those categories. In particular, Massachusetts courts rely on State House News Service articles as the functional equivalent of the Congressional Record for legislative history. *See, e.g.*, *Commonwealth v. Pon*, 469 Mass. 296, 305 (2014); *Commonwealth v. Bradley*, 466 Mass. 551, 558 (2013).

18 U.S.C. §§ 921(a)(30), 922(v) (1994) (attached as Deft's Ex. B).[2] The second approach, which became known as the Features Test, banned any semiautomatic rifle, pistol, or shotgun that had two or more combat-style features, and for rifles and pistols, that had the ability to accept a detachable magazine. § 110102(b); 108 Stat. at 1996, 1998. Examples of the combat-style features included folding or telescoping stocks, flash suppressors, grenade launchers, bayonet mounts, and pistol grips that protrude beneath the action on the weapon. *Id.*

The ban did not apply to assault weapons that were possessed lawfully before September 13, 1994, the enactment date of the statute. § 110102(a); 108 Stat. at 1997. The law also exempted 661 rifles and shotguns, listed on Appendix A to the statute, that were commonly used in hunting and target practice. § 110102(a); 108 Stat. at 1997, 2000–10. Many of these were semiautomatic weapons. *See id.* (listing "autoloaders"). And the law made clear that several other categories of weapons were exempted, including "any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition" and "any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine." § 110102(a); 108 Stat. at 1997.

In the years after the passage of the Federal Assault Weapons Ban, gun manufacturers "sought to evade the ban by producing weapons with minor changes or new model names." 150 Cong. Rec. S1901–04, S1909–04, 2004 WL 372453 (Mar. 1, 2004) (Sen. Feinstein). Even though the "Act was designed to prevent this occurrence by defining assault weapons to include 'copies or duplicates' o[f] the firearms listed in the ban in any caliber," that provision was "never . . .

---

[2] Those Enumerated Weapons are: "(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models); (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR, and FNC; (vi) SWD M-10, M-11, M-11/9, and M-12; (vii) Steyr AUG; (viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12." Pub. L. No. 103–322, § 110102(b); 108 Stat. 1796, 1997–98; codified at 18 U.S.C. § 921(a)(30)(A) (1994).

enforced" by ATF or other federal authorities. *Id.*

## II.     The 1998 Massachusetts Assault Weapons Ban.

Four years after the Federal Assault Weapons Ban went into effect, the Massachusetts Legislature enacted a state version of an assault weapons ban. Part of the 1998 Act Relative to Gun Control, the state Assault Weapons Ban provided that "[n]o person shall sell, offer for sale, transfer or possess an assault weapon or a large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994." St. 1998, c. 180, § 47; codified at G.L. c. 140, § 131M. The Act also prohibited licensed gun dealers from selling or offering to sell "to any person any assault weapon or large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994." St. 1998, c. 180, §§ 19, 23; codified at G.L. c. 140, §§ 123 and 128. Both provisions set forth criminal penalties for their violation. *See* G.L. c. 140, §§ 128, 131M.

The Legislature adopted nearly the same definition of "assault weapon" that Congress employed. The final bill provided that "'[a]ssault weapon['] shall have the same meaning as a semiautomatic assault weapon as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(30)." St. 1998, c. 180, § 8; codified at G.L. c. 140, § 121 (1998).[3] Thus, like the federal statute, the Massachusetts law defined assault weapons with two independent tests. First, the Massachusetts statute defined "[a]ssault weapon[s]" to "include, but not be limited to" 19 models or variations of semiautomatic weapons, like the Colt AR-15; all AK models, including the AK-47; and others. St. 1998, c. 180, § 8; G.L. c. 140, § 121. The definition included "copies or duplicates of th[os]e [enumerated] weapons, of any caliber." *Id.* Second, by referencing the federal statute, the state statute separately adopted the Features Test,

---

[3] *See also Jacques, Birmingham Announce Final Enactment of Assault Weapons Bill*, State House News Service (July 20, 1998) ("The enacted bill . . . [c]odifies the federal assault weapons ban, prohibiting possession or sale of assault weapons or high capacity magazines manufactured after September 13, 1994.") (attached as Deft's Ex. C).

which generally banned any semiautomatic rifle, pistol, or shotgun that had the ability to accept a detachable magazine and had two or more of the aforementioned combat-style features. *Id.*

The law also contained exceptions that tracked the federal statute. *Id.* For example, all 661 rifles and shotguns listed on Appendix A to the federal statute were exempted from the state law, as were "any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition" and "any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine," among other exceptions. *Id.*

Like Congress, the Legislature enacted the state Assault Weapons Ban to stem the flow of especially dangerous, military-style weapons into Massachusetts communities. Senator Jacques, a co-sponsor of the legislation, identified the risks posed by assault weapons: "Military style assault weapons are . . . designed for one purpose and one purpose only—to kill as many people as possible, as quickly as possible . . . . They are the weapons of choice for cop killers, drug dealers, and juvenile gang members." *Jacques Confident Assault Weapons Ban Will Pass Next Session*, State House News Service (Dec. 3, 1996) (attached as Deft's Ex. D). A "true sportsm[a]n doesn't need an Uzi to hunt a bunny rabbit or a deer," Representative Hodgkins, another co-sponsor of the legislation, emphasized. *Id.*  Speaking in favor of the legislation on the Senate floor, Senator Pines stressed that "[a]ssault weapons are weapons of overkill. There is not a rational defense for allowing battlefield weapons to be available on the streets. [* * *] That's why chiefs of police support a ban on the sale of assault weapons." Senate Copy, State House News Service, at 3 (July 16, 1998) (attached as Deft's Ex. E).

III.    **The 2004 Reauthorization of Massachusetts Assault Weapons Ban.**

The 1998 Massachusetts Assault Weapons Ban was originally tied to the 1994 federal ban, which by its terms expired on September 13, 2004, and was not reauthorized. *See* St. 1998, c. 180,

§§ 8, 47; Pub. L. No. 103–322, § 110105(2); 108 Stat. at 2000. To ensure that the Massachusetts law continued in force, the Legislature in 2004 made the state ban permanent. *See* St. 2004, c. 150, § 1; codified at G.L. c. 140, § 121.

In signing that bill into law, Governor Romney emphasized the vital public safety purpose of the state's Assault Weapons Ban. Assault weapons "are not made for recreation or self-defense," he said. "They are instruments of destruction with the sole purpose of hunting down and killing people." A. Lambiaso, *Romney Signs Assault Weapons Ban Extension, Changes in Gun Licensing*, State House News Service (July 1, 2004) (attached as Def't's Ex. F). Governor Romney added that the law making the ban permanent made the state "safer," but also preserved the rights of the Commonwealth's "great sportsmen." *Id.* Legislators likewise emphasized that the 2004 bill struck a balance between keeping assault weapons off the street and ensuring that Massachusetts residents would retain access to firearms used in hunting, target shooting, and other lawful activities. *See* Senate Session, State House News Service, at 5 (May 27, 2004) (Sen. Barrios) ("All these gun bills are balancing acts between the rights of law-abiding sportsmen and the need to protect public safety from malicious criminals.") (attached as Def't's Ex. G).

## IV.    The Attorney General's 2016 Enforcement Notice on Assault Weapons.

Since the expiration of the Federal Assault Weapons Ban, our country has experienced a surge in mass shootings committed with semiautomatic assault weapons—children and teachers murdered in Newtown, Connecticut; moviegoers in Aurora, Colorado; county employees in San Bernardino, California; patrons of the Pulse nightclub in Orlando, Florida; police officers in Baton Rouge, Louisiana; and many more. *See* Compl. Exs. J, K, L.

After these massacres, Attorney General Healey sought to assess the risk that assault weapons posed to Massachusetts residents. *See id.* Her office learned that, in 2015 alone, more

than 10,000 assault weapons had been sold in Massachusetts, despite the state's permanent Assault Weapons Ban. *See* Compl. Exs. J, K, L. These weapons were virtually identical in function and design to some of the 19 banned Enumerated Weapons, but they were being manufactured and marketed without, for example, flash suppressors and folding stocks, in order to bypass the Features Test in the Assault Weapons Ban. *See id.* But, regardless of whether they passed muster under the Features Test, manufacturers and dealers had not discharged their separate obligation to ensure that the weapons were not prohibited "copies or duplicates" of the Enumerated Weapons, including copies of the Colt AR-15 or the AK-47. *See id.*

To address this problem, the Attorney General, as chief law enforcement officer for the Commonwealth, issued a public advisory, titled "Enforcement Notice: Prohibited Assault Weapons," on July 20, 2016. *See* Compl. Ex. G. The purpose of the Notice was "to provide a framework to gun sellers and others for understanding the definition of 'Assault weapon' contained in G.L. c. 140, § 121." *Id.* at 1. More specifically, the Notice aimed to "provid[e] guidance on the identification of weapons that are 'copies' or 'duplicates' of the enumerated Assault weapons that are banned under Massachusetts law." *Id.*

After outlining the structure of the state Assault Weapons Ban, the Notice explained how the Attorney General interprets the phrase "copies or duplicates" in the statute. *Id.* at 3. A weapon is a copy or duplicate of an Enumerated Weapon if it "1) is a semiautomatic rifle or handgun that was manufactured or subsequently configured with an ability to accept a detachable magazine, or 2) a semiautomatic shotgun," and if it meets one or both of the following two tests. *Id.* Under the Similarity Test, "[a] weapon is a Copy or Duplicate if its internal functional components are substantially similar in construction and configuration to those of an Enumerated Weapon." *Id.* The test then provided an example of its application: "[A] weapon is a Copy or Duplicate, for

example, if the operating system and firing mechanism of the weapon are based on or otherwise substantially similar to one of the Enumerated Weapons." *Id.* Under the Interchangeability Test, "[a] weapon is a Copy or Duplicate if it has a receiver[4] that is the same as or interchangeable with the receiver of an Enumerated Weapon. A receiver will be [so] treated . . . if it includes or accepts two or more operating components that are the same as or interchangeable with those of an Enumerated Weapon." *Id.* at 4. "Such operating components may include, but are not limited to: 1) the trigger assembly; 2) the bolt carrier or bolt carrier group; 3) the charging handle; 4) the extractor or extractor assembly; or 5) the magazine port." *Id.*

The Notice clarified that "[p]urely cosmetic similarities to an Enumerated Weapon, such as finish, appearance, or shape of the stock, or appearance or shape of the rail, will not be treated as relevant to a determination of whether a weapon is a copy or duplicate." *Id.* What matters, the Notice explained, is whether a weapon meets the Similarity or Interchangeability Test. *Id.* If it does, the fact that the weapon has been marketed as "Massachusetts compliant" would not affect its status as a copy or duplicate of an Enumerated Weapon. *Id.* The Notice also explained that, in the exercise of the Attorney General's prosecutorial discretion, the interpretation of "copies or duplicates" contained in the Notice would be applied prospectively only. *Id.*

## V.      **Allegations in the Amended Complaint.**

Two months after the Attorney General issued the Enforcement Notice, the plaintiffs, four gun dealers and an advocacy organization, brought this lawsuit. On November 22, 2016, the Attorney General moved to dismiss the original complaint. In response, the plaintiffs filed an amended complaint on December 13 (hereafter "complaint" or "Compl."). Alleging state-law

---

[4] The receiver, or frame of the weapon, is generally understood as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11 (defining "[f]irearm frame or receiver").

claims and federal constitutional claims, the plaintiffs seek declaratory relief and an injunction that would prevent the Attorney General from enforcing the Notice. In particular, the plaintiffs claim that the Notice violates Massachusetts law because it exceeds the Attorney General's authority, is inconsistent with the Massachusetts Assault Weapons statute, and is arbitrary and capricious. Compl. ¶¶ 79, 94. In addition, the plaintiffs claim that the Notice is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment and, if "broadly interpreted," would violate the Second Amendment. Compl. ¶¶ 75, 76, 80, 84, 90, 91, 95, 99.

## ARGUMENT

## I.    This Court Lacks Jurisdiction to Adjudicate the Plaintiffs' State-Law Claims.

The complaint alleges that the Enforcement Notice is inconsistent with Massachusetts law in three respects. First, it alleges that the Attorney General lacked legal authority to issue the Notice. *See* Compl. ¶¶ 79, 94. Second, it alleges that the Attorney General's interpretation of the phrase "copies or duplicates" is an impermissible interpretation of the state Assault Weapons Ban and contrary to the Massachusetts Legislature's intent. *See id.* Third, referencing the standard set forth in the Massachusetts Administrative Procedure Act, it alleges that the Notice is "arbitrary and capricious and an abuse of discretion or is not otherwise in accordance with the law." *Id.*

These claims are all barred by the Eleventh Amendment, which shields state officials from defending against state-law claims brought in federal court. And even if this Court had jurisdiction, each claim would fail as a matter of law. The Attorney General plainly had authority, as the chief law enforcement officer of the Commonwealth, to notify the public of her interpretation of a criminal law she is charged with enforcing. Her interpretation of the phrase "copies or duplicates" is entirely consistent with the text, legislative history, and purpose of the state Assault Weapons Ban. And her issuance of the Notice was the antithesis of "arbitrary" government action: Rather

than suddenly initiate prosecutions against persons who transferred copies of the Enumerated Weapons, she provided advance notice of her interpretation of the law.

A. **All of the Plaintiffs' State-Law Claims Are Barred by the Eleventh Amendment.**

The Eleventh Amendment to the United States Constitution bars lawsuits in federal court against unconsenting States. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (any federal court lawsuit "in which the State or one of its agencies . . . is named as the defendant is proscribed by the Eleventh Amendment"); *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) (same). The Eleventh Amendment also bars official-capacity suits against state officials because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). As a state official sued in her official capacity, *see* Compl. ¶ 11, the Attorney General shares in the Commonwealth's Eleventh Amendment immunity. *See Will*, 491 U.S. at 71; *Maysonet-Robles v. Cabrero*, 323 F.3d 43, 48–49 (1st Cir. 2003).[5]

A key tenet of the Eleventh Amendment doctrine, first announced in *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984), prohibits lawsuits in federal court against state officials based on alleged violations of state law. *See id.* at 106. As the Supreme Court explained in *Pennhurst*, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* The Court

---

[5] There are three narrow exceptions to a State's Eleventh Amendment immunity. First, Congress "may abrogate a State's immunity by expressly authorizing such a suit pursuant to a valid exercise of power." *Maysonet-Robles v. Cabrero*, 323 F.3d 43, 49 (1st Cir. 2003). Second, "a State may waive its sovereign immunity by consenting to be sued in federal court." *Id.* Third, a plaintiff may seek prospective injunctive relief against a state official for an ongoing violation of <u>federal</u> law by suing that official in her official capacity. *See Rosie D. v. Swift*, 310 F.3d 230, 234 (1st Cir. 2002). None of the exceptions is applicable to the plaintiffs' state-law claims here.

thus held that the exception to Eleventh Amendment immunity established in *Ex parte Young*, 209 U.S. 123 (1908)—which authorizes suits for prospective injunctive relief against state officials based on ongoing violations of <u>federal</u> law, *see supra*, note 5—is "inapplicable in a suit against state officials on the basis of <u>state</u> law." *Pennhurst*, 465 U.S. at 106 (emphasis added). And the Court also held that because "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment," the doctrine applies as readily to "state-law claims brought into federal court under pendent jurisdiction." *Id.* at 121.

The *Pennhurst* doctrine is applied widely and uniformly across federal courts. The First Circuit has confirmed that "[i]t is not the proper purview of a federal court to supervise state officials' compliance with state law." *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998); *see also Lopez v. Massachusetts*, 588 F.3d 69, 73 n. 1 (1st Cir. 2009) ("[T]he Eleventh Amendment clearly bars [a claim under the state antidiscrimination statute] in federal court against the state defendants."). Other courts of appeals are in accord. *See, e.g.*, *LaShawn A. by Moore v. Barry*, 144 F.3d 847, 852 (D.C. Cir. 1998) ("[T]he Eleventh Amendment denies federal courts jurisdiction to order state officials to conform their conduct to state law."); *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988) (en banc) ("[F]ederal courts lack the authority to direct state officials to comply with state law.").

*Pennhurst* prevents this Court from exercising jurisdiction over any of the plaintiffs' state-law claims. *See Villanueva v. United States*, 662 F.3d 124, 126 (1st Cir. 2011) (sovereign immunity "is jurisdictional in nature"). Each of the claims asks this Court to declare that the Attorney General's Enforcement Notice is inconsistent with state law. *See* Compl. ¶¶ 79, 94. All are therefore barred by the Eleventh Amendment and must be dismissed for lack of jurisdiction.

**B. Even If the Plaintiffs' State-Law Claims Were Not Barred by the Eleventh Amendment, They Would Fail as a Matter of Law.**

Even if this Court had jurisdiction to entertain the plaintiffs' state-law claims, which it does not, each of the state-law claims would also fail as a matter of law because the Attorney General's Enforcement Notice is entirely consistent with Massachusetts law.

**1. The Enforcement Notice Was Issued in Accordance with the Attorney General's Authority as the Chief Law Enforcement Officer of the Commonwealth.**

The Attorney General acted well within her authority when she interpreted the phrase "copies or duplicates" in the Massachusetts Assault Weapons ban, and when she notified the public of her interpretation through the Enforcement Notice. Under Massachusetts law, the Attorney General is the chief law enforcement officer for the Commonwealth. *Town of Burlington v. Dist. Att'y for the N. Dist.*, 381 Mass. 717, 720 (1980); *Commonwealth v. Kozlowsky*, 238 Mass. 379, 388 (1921). "[A]s the chief law officer of the state, [s]he may, in the absence of some express legislative restriction to the contrary, exercise all such power and authority as public interests may from time to time require." *Kozlowsky*, 238 Mass. at 390 (internal quotation marks omitted). She therefore has "extensive power . . . in criminal prosecutions," confirmed by the "exce[e]dingly broad" language in G.L. c. 12, § 10, which authorizes her to "take cognizance of all violations of law or of orders of courts, tribunals or commissions affecting the general welfare of the people." *Kozlowsky*, 238 Mass. at 389–90.

As the chief law enforcement officer of the Commonwealth, the Attorney General has "wide discretion in determining whether to prosecute an individual" under any given criminal statute. *Commonwealth v. Clint C.*, 430 Mass. 219, 228 (1999); *see also Shepard v. Attorney General*, 409 Mass. 398, 401 (1991). That discretion is rooted in Article 30 of the Massachusetts Declaration of Rights, which "creates a separation of power between the branches of government

essentially granting the prosecutor exclusive power to decide whether to prosecute a case." *Commonwealth v. Pellegrini*, 414 Mass. 402, 404 (1993).

When the Attorney General makes charging decisions, she must, like all prosecutors, interpret the criminal laws she is sworn to enforce. *See Commonwealth v. Twitchell*, 416 Mass. 114, 128–29 (1993) (as "the chief law officer of the Commonwealth," the Attorney General is "charged by law with the responsibility for the interpretation or enforcement of the law defining the offense").[6] Many criminal laws contain terms or phrases that are not defined by statute or that may be subject to interpretation. *See, e.g.*, G.L. c. 265, § 1 ("extreme atrocity or cruelty"); G.L. c. 265, § 15A ("dangerous weapon"); G.L. c. 265, § 43 ("seriously alarms or annoys [another] person"); G.L. c. 119, § 54 ("infliction or threat of serious bodily harm"). The absence of a statutory definition for such terms does not prevent prosecutors from enforcing criminal statutes. Instead, it simply requires them to use tools of statutory construction and their best judgment to determine whether a defendant has violated a statute and whether to seek an indictment. Courts may later confirm or correct their understanding of the law if a prosecution is brought.

For example, when the Attorney General interprets a criminal law to prohibit a defendant's conduct and, accordingly, seeks an indictment, the defendant may challenge her interpretation through a motion to dismiss. *See, e.g.*, *Clint C.*, 430 Mass. at 220; *Commonwealth v. Richards*, 426 Mass. 689, 689–90 (1998); *Commonwealth v. Cintolo*, 415 Mass. 358, 358–59 (1993). In such a motion, the statutory interpretation question is a "pure issue of law," in which the defendant contests "the [a]pplicability of the statute to the complained-of conduct." *Richards*, 426 Mass. at 691. There is no reason why the Massachusetts Assault Weapons Ban should be treated differently.

---

[6] *Cf. Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment) ("The Justice Department, of course, has a very specific responsibility to determine for itself what this statute means, in order to decide when to prosecute."); 38 C.F.R. § 14.560 ("The Department of Justice, or the U.S. Attorneys, are charged with the duty and responsibility of interpreting and enforcing criminal statutes.").

Because the phrase "copies or duplicates" is not defined in the statute, *see* G.L. c. 140, § 121, the Attorney General must interpret that phrase when she makes charging decisions, just as she would with any other undefined statutory term. If she were to ask the grand jury to indict a defendant for selling a copy of an Enumerated Weapon, the indictment would be based on her interpretation of the phrase "copies or duplicates," and the defendant could challenge that interpretation through a motion to dismiss or a challenge to proposed jury instructions.

When the Attorney General learned that thousands of copies of the Enumerated Weapons were sold in 2015 alone in Massachusetts, she did not immediately initiate criminal prosecutions. Rather, in the interest of transparency and fairness, she issued a public advisory—the Enforcement Notice—that explained how she would interpret the phrase "copies or duplicates." As the Attorney General's website describes, "The Enforcement Notice explains how the AGO will enforce a law—the Assault Weapons ban—that was enacted in 1998 to promote public safety. By issuing the notice, the Attorney General hopes and expects that non-compliant gun dealers will come into voluntary compliance with the law." Compl. Ex. A, at 3.   No legislative restriction prevents the Attorney General, or any other prosecutor in the Commonwealth, from providing the public with notice of how she interprets a criminal law, by way of an enforcement notice or other legal advisory.

Nor is it unusual for the Attorney General to notify the public of her interpretation of criminal laws she is charged with enforcing. For example, the Attorney General regularly issues Advisories that interpret Massachusetts wage and employment laws that carry criminal penalties. *See, e.g.*, Advisory No. 2008/1 (attached as Deft's Ex. H); Advisory No. 1998/1 (attached as Deft's Ex. I). Like the Enforcement Notice, such Advisories aim "to provide notice of the Attorney

General's interpretation of the state statutory requirements." Advisory No. 1998/1, at 1.[7] Similarly, the Attorney General has issued formal opinion letters that interpret criminal laws enforced by her Office. *See, e.g.*, 1989–90 Mass. Op. Att'y Gen. No. 4, 1990 WL 508739 (Jan. 19, 1990); 1981–82 Mass. Op. Att'y Gen. No. 9, 1982 WL 188378 (Feb. 11, 1982).

Attorneys General in other jurisdictions likewise have authority to issue notices that advise the public of their interpretation of criminal statutes. In 2010, the Attorney General of Maryland issued a notice that interpreted the statutory term "copies" in Maryland's Assault Weapons Ban. *See* 95 Md. Op. Atty. Gen. 101, 2010 WL 2351491 (May 24, 2010). The Fourth Circuit relied on that notice in rejecting a vagueness challenge to the statute; nowhere did the court suggest that the notice exceeded the Maryland Attorney General's authority. *See Kolbe v. Hogan*, 813 F.3d 160, 191 (4th Cir. 2016), *reh'g en banc granted*, No. 14–1945 (4th Cir. Mar. 4, 2016).[8]

In contending that the Attorney General lacked authority to issue the Enforcement Notice, the complaint mischaracterizes the nature of her action. Several paragraphs refer to the Enforcement Notice as an impermissible "regulation," issued without a public hearing or a public comment period. *See, e.g.*, Compl. ¶¶ 40 (citing G.L. c. 30A), 41, 51–52, 55. But the Enforcement Notice is not a regulation. It is an advisory that notifies the public of the Attorney General's interpretation of a criminal statute she is bound to enforce. To be sure, the Attorney General has separate authority to issue regulations under the state Consumer Protection Act, G.L. c. 93A,

---

[7] State and federal courts look to these Advisories in cases involving interpretation of wage and employment laws. *See, e.g.*, *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 465 Mass. 607, 624 (2013) (citing Advisory No. 2008/1); *Martins v. 3PD, Inc.*, No. 11–cv–11313-DPW, 2013 WL 1320454, at *7, 13 (D. Mass. Mar. 28, 2013) (same).

[8] Other Attorneys General likewise commonly issue guidance on their interpretation of criminal laws. *See, e.g.*, U.S. Dept. of Justice, *Guidance Regarding Marijuana Enforcement* (Aug. 29, 2013) (attached as Def't's Ex. J) (interpreting provisions of the Controlled Substance Act pertaining to marijuana); Office of the New Jersey Attorney General, *Clarification of the "Graves Act" 2008 Directive with Respect to Offenses Committed by Out-of-State Visitors From States Where Their Gun-Possession Conduct Would Have Been Lawful* (Sept. 14, 2014) (attached as Def't's Ex. K) (interpreting New Jersey statute).

§ 2(c), but she did not exercise that authority here. Instead, she simply announced to the public, in advance of any potential prosecution, how she construes a phrase in a criminal statute committed to her enforcement. There is no requirement for a hearing, a notice-and-comment period, or any other process associated with the promulgation of regulations when the Attorney General issues such an alert.

### 2.  The Enforcement Notice is Consistent with the Plain Text, Statutory Purpose, and Legislative History of the Massachusetts Assault Weapons Ban.

The second state-law claim alleges that the Attorney General's interpretation of "copies or duplicates" is inconsistent with the state Assault Weapons Ban. Compl. ¶¶ 79, 94. The claim is likewise barred by the Eleventh Amendment and, in all events, would fail as a matter of law. The statute, as discussed, bans the possession and transfer of "[a]ssault weapons," G.L. c. 140, § 131M, and provides that the term "'[a]ssault weapon' shall have the same meaning as" the 1994 Federal Assault Weapons Ban. G.L. c. 140, § 121. Both the federal and state Assault Weapons Bans, in turn, define "[a]ssault weapon" to include "copies or duplicates" of 19 enumerated models or variations of weapons, like the Colt AR-15 or the AK-47, "of any caliber," but neither defines the phrase "copies or duplicates." G.L. c. 140, § 121; *see also* 18 U.S.C. § 921(a)(30) (1994).

Under Massachusetts law, "'[w]hen a statute does not define its words[, the courts] give them their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose.'" *Clint C.*, 430 Mass. at 225 (quoting *Commonwealth v. Campbell*, 415 Mass. 697, 700 (1993)). Here, the Attorney General's interpretation expresses the usual and accepted meaning of the phrase "copies or duplicates," honors the purpose of the Legislature in enacting the ban, and is consistent with relevant legislative history.

17

### a. __The Enforcement Notice Is Consistent with the Plain Text of the Statute.__

The place to start is the plain meaning of the statute. The *Oxford English Dictionary* defines a "copy" as "a thing made to be similar or identical to another." *Concise Oxford English Dictionary*, at 316 (12th ed. 2011). And *Webster's* defines a "copy" as "a reproduction or imitation of an original." *Webster's II New College Dictionary*, at 249 (1995). Courts employ a similar definition. *See Country Vintner of N. Carolina, LLC v. E. & J. Gallo Winery, Inc.*, 718 F.3d 249, 258 (4th Cir. 2013) (a "copy" is "an imitation, transcript, or reproduction of an original work"); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 166 (3d Cir. 2012) (same). A "duplicate," in contrast, is "exactly like something else, especially through having been copied"; "one of two or more identical things." *Concise Oxford English Dictionary*, at 444 (12th ed. 2011).

Under Massachusetts law, courts must "interpret statutes so as to avoid rendering any part of the legislation meaningless." *Boston Police Patrolmen's Ass'n, Inc. v. City of Boston*, 435 Mass. 718, 721 (2002); *see also Commonwealth v. Magnus M.*, 461 Mass. 459, 464 (2012) ("[E]ffect must be given to all of a statute's provisions, so that none will be 'inoperative' or 'superfluous.'"). Thus, "[w]here the Legislature employs two similar terms or phrases in the same statutory series, [courts] are required to construe them differently if each is to have meaning." *Halebian v. Berv*, 457 Mass. 620, 629 n. 12 (2010); *accord 81 Spooner Rd. LLC v. Town of Brookline*, 452 Mass. 109, 114 (2008) ("Although these two terms are often used synonymously, their appearance in the same statutory series requires us to construe them differently if each is to have meaning.").

As described, the definitions of the terms "copies" and "duplicates" are similar, but not identical. A "copy" can be an exact replica, but it can also be something that is "similar to" another or an "imitation" of another. "Duplicate," on the other hand, has a narrower definition; it is an exact replica of another. In order to construe the terms differently so that each has meaning, *see*

18

*Halebian*, 457 Mass. at 629 n. 12, the term "copy" must be interpreted more broadly than the term "duplicate." "Copies," therefore, must encompass weapons that are similar to or imitations of the Enumerated Weapons, while "duplicates" must encompass weapons that are identical to or exact replicas of the Enumerated Weapons.

The Legislature's use of the word "or" to separate the terms "copies" and "duplicates" confirms this interpretation. "The word 'or' is given a disjunctive meaning unless the context and the main purpose of all the words demand otherwise." *Commonwealth v. O'Keefe*, 48 Mass. App. Ct. 566, 568 (2000); *accord Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgmt. Bd.*, 421 Mass. 196, 212 (1995). Consistent with this canon, the word "or" implies that the Legislature intended the terms "copies" and "duplicates" to have different meanings, and for "copies" to therefore cover a broader range of imitation weapons than "duplicates."

The Attorney General's interpretation of the phrase "copies or duplicates" aligns with this construction. It considers a weapon to be a "cop[y] or duplicat[e]" of a banned Enumerated Weapon if that weapon's "internal functional components are substantially similar in construction and configuration to those of an Enumerated Weapon," or if that weapon "has a receiver that is the same as or interchangeable with the receiver of an Enumerated Weapon." Compl. Ex. G, at 3–4. These functional tests serve to identify a "copy" of an Enumerated Weapon—that is, one similar to or an imitation of an Enumerated Weapon. Indeed, by requiring the weapon's internal functional components to be "*substantially* similar" in construction and configuration to those of an Enumerated Weapon, or to have an "*interchangeable*" receiver, the tests adopted by the Attorney General are actually narrower than the straightforward dictionary definition of the term "cop[y]" in the Massachusetts Assault Weapons Ban.

The plaintiffs' preferred definition of the phrase "copies or duplicates," on the other hand,

is inconsistent with the plain text of the statute. The plaintiffs would read the phrase to only encompass weapons that are exact replicas of the Enumerated Weapons, but have been given different names. *See* Compl. ¶ 31. That interpretation aligns with the definition of the term "duplicates," but it would read the term "copies" out of the statute, because it would exclude weapons that are similar to or imitations of Enumerated Weapons. And the interpretation is therefore inconsistent with the requirement that courts interpret statutes "so as to avoid rendering any part of the legislation meaningless." *Boston Police Patrolmen's Ass'n*, 435 Mass. at 721.

Two other textual considerations show that the phrase "copies or duplicates" includes weapons that are similar to or imitations of an Enumerated Weapon. First, the Assault Weapons Ban specifies that "copies or duplicates" of the Enumerated Weapons, "<u>of any caliber</u>," are prohibited. G.L. c. 140, § 121 (emphasis added); *see also* 18 U.S.C. § 921(a)(30)(A) (1994). Redesigning an Enumerated Weapon to accept a different caliber bullet—that is, a different sized bullet—can, however, require a different sized barrel, firing mechanism, and bolt carrier to accommodate the larger or smaller bullet. The Legislature therefore must have expected that "copies or duplicates . . . of any caliber" would include weapons that are not exact replicas of the Enumerated Weapons. The plaintiffs' narrow interpretation of "copies or duplicates," which would cover only exact replicas of the Enumerated Weapons renamed, is, accordingly, inconsistent with the Legislature's prohibition on "copies or duplicates . . . of any caliber." G.L. c. 140, § 121.

Second, although the Massachusetts Legislature adopted the definition of "assault weapon" contained in the Federal Assault Weapons Ban, it made one significant addition to the statute. Specifically, it added the words "shall . . . not be limited to," so that the definition of "[a]ssault weapon . . . shall include, <u>but not be limited to</u>, any of the weapons, or copies or duplicates of the weapons, of any caliber, known as" the Enumerated Weapons. G.L. c. 140, § 121 (emphasis

added). By enlarging Congress's definition of "assault weapon" in that one significant respect, the Massachusetts Legislature emphasized that prohibited assault weapons are not limited to the specific list of Enumerated Weapons or replicas of those weapons.

### b.   The Enforcement Notice Honors the Intent of the Legislature.

The statutory purpose of the state Assault Weapons Ban further supports the Attorney General's interpretation of "copies or duplicates." The Legislature enacted the law to stop the flow of deadly assault weapons, modeled after combat-style military weapons, into Massachusetts communities. The sponsors of the legislation emphasized that assault weapons are designed to kill as many people as possible, as quickly as possible, and are not the types of weapons needed by hunters and target shooters for lawful activities. *See* Deft's Ex. D. Thus, the Legislature sought to balance the rights of law-abiding gun owners against the imperative to keep combat-style military weapons off the street. *See supra*, at 5–7; Deft's Exs. D–G.

The Attorney General's interpretation of "copies or duplicates" honors this legislative purpose. For years, manufacturers evaded the state's Assault Weapons Ban by designing weapons with minor modifications to the Enumerated Weapons and marketing them as "Massachusetts compliant." *See* Compl. Ex. J, K, L.  But those weapons have the same military-style construction, the same functionality, and the same lethality as the Enumerated Weapons. By explaining that the phrase "copies or duplicates" covers weapons whose internal functional components are "substantially similar" in construction and configuration to those of an Enumerated Weapon, or that have an "interchangeable" receiver, the Enforcement Notice ensures that copycats of the Enumerated Weapons will not be available for sale. That aligns with the Legislature's aim of keeping deadly assault weapons out of Massachusetts. Deft's Exs. D–F. At the same time, weapons that are not copies or duplicates of Enumerated Weapons, or that fall into the exemptions to the

ban, remain available for sale. *See* Compl. Ex. G, at 3 n. 3. That result likewise aligns with the Legislature's aim of ensuring that weapons needed for hunting, target practice, and other lawful purposes remain available in Massachusetts. *See* Deft's Exs. D, F, G.

In contrast, the plaintiffs' interpretation of the phrase "copies or duplicates"—which would include only renamed replicas of the Enumerated Weapons—would frustrate the intent of the Legislature. It would permit the unchecked sale of weapons with the same military-style construction, the same functionality, and virtually the same design as the Enumerated Weapons. It is clear that the Legislature did not intend copycat weapons, which pose just as much of a risk to the public and police officers as Enumerated Weapons, to continue to threaten Massachusetts communities. *Cf. Champigny v. Commonwealth*, 422 Mass. 249, 251 (1996) (refusing to adopt interpretation of statute that would cause it to have "no practical effect").

### c.   The Enforcement Notice Is Consistent with Legislative History.

The legislative history of the Assault Weapons Ban also supports the Attorney General's interpretation of "copies or duplicates." Although the Legislature initially considered several draft bills that would have differed from the Federal Assault Weapons Ban,[9] it decided to adopt the federal statute's approach to banning assault weapons. The Legislature made that approach clear in the text of the statute, *see* G.L. c. 140, § 121, as well as in statements from the bill's sponsors. *See supra*, at 5 note 3. Persuasive evidence regarding the sweep of the phrase "copies or duplicates" in the state ban, then, can be gleaned from the legislative history of the federal ban.

That legislative history demonstrates that Congress intended "copies or duplicates" to

---

[9] The complaint refers to an early draft of the Massachusetts Assault Weapons Ban, S. 1985, which proposed a definition for the term "copy." *See* Compl. ¶¶ 34–35 & Ex. F. The Legislature's decision to adopt the phrase "copies or duplicates" from the federal statute rather than S. 1985's proposed definition of "copy" does not, however, indicate that "copies or duplicates" must be read narrowly. Instead, it simply indicates that the Legislature sought to align the state statute with the federal statute, including the plain meaning of the phrase "copies or duplicates."

encompass weapons that were similar to or imitations of the Enumerated Weapons. Indeed, the Congressional Record is replete with legislators' references to the "19 specified assault weapons and their copycat models" that would be banned under the bill. *See, e.g.*, 140 Cong. Rec. H8968–01, H9000–01, 1994 WL 461399 (Aug. 21, 1994) (Rep. Mfume).[10] Senator Feinstein, who sponsored the Senate legislation that served as the model for the final version of the Federal Assault Weapons Ban, similarly understood the bill to encompass "19 semiautomatic assault weapons and their copycat versions." *See* 140 Cong. Rec. S4388–01, S4388–01, 1994 WL 137546 (May 5, 1994); 140 Cong. Rec. S1793–01, S1793–01, 1994 WL 56153 (Feb. 24, 1994). And when the legislators spoke of the 19 banned weapons, they often referred to the generic form of the weapon, rather than a particular model identified in the statute. For example, legislators frequently referred to an "AR-15" rather than a "Colt AR-15," indicating that they expected all such weapons to be banned under the "copies or duplicates" language. *See, e.g.*, 140 Cong. Rec. S12399–03, S12413–03, 1994 WL 460054 (Aug. 24, 1994) (Sen. Feinstein) ("we want the free flow of AR-15's to the streets stopped").[11]

The plaintiffs claim that two items of federal legislative history support a narrower construction of the phrase "copies or duplicates." In fact, each supports the Attorney General's interpretation. First, the complaint refers to the following statement from then-Senator Biden: "To

---

[10] *See also, e.g.*, 140 Cong. Rec. S12137–02, S12138–02, 1994 WL 449789 (Aug. 19, 1994) (Sen. DeConcini) ("19 assault weapons and copycat models"); 140 Cong. Rec. H7934–01, H7934–01, 1994 WL 422560 (Aug. 4, 1994) (Rep. Derrick) ("19 listed weapons, copycats, and other clearly defined semiautomatic guns"); 140 Cong. Rec. S9998–02, S10007–02, 1994 WL 393151 (July 28, 1994) (Sen. Craig) ("19 specified assault weapon models and any copycat versions"); 140 Cong. Rec. E887–03, E887–03, 1994 WL 181496 (May 5, 1994) (Rep. Vento) ("19 specific semiautomatic weapons and their copycats"); 140 Cong. Rec. H3063–05, H3079–05, 1994 WL 170996 (May 5, 1994) (Rep. Lazio) ("this bill includes provisions to control the spread of so-called copycat weapons").

[11] *See also, e.g.*, 140 Cong. Rec. S12242–01, S12244–01, 1994 WL 455043 (Aug. 22, 1994) (Sen. Feinstein) (referring to a "rookie police officer in Los Angeles—and mother of two—[who] was killed with an AR-15"); 140 Cong. Rec. H3063–05, H3080–05, 1994 WL 170996 (May 5, 1994) (Rep. Andrews) ("The bill . . . specifically targets high-velocity, rapid-fire weapons—like Uzi's, AK-47's, TEC-9's, and MAC-10's, and AR-15's—that have become the weapons of choice for drug dealers, street gangs, and hate groups.").

avoid the so-called copycat problem—where manufacturers simply rename guns to avoid State assault weapons legislation—the amendment makes clear that replicas and duplicates of the listed firearms are covered as well." Compl. ¶ 31 (citing 139 Cong. Rec. S15411–01, 15459–01, 1993 WL 467078 (Nov. 2, 1993)). Senator Biden made that statement when the Senate was debating a proposed amendment that was the precursor to the Assault Weapons Ban. But the final version of the federal law banned "copies or duplicates" of the Enumerated Weapons, and not the "types, replicas, or duplicates" of the Enumerated Weapons referred to in the proposed amendment. *See* 139 Cong. Rec. S15475–01, 15479–01, 1993 WL 467099 (Nov. 9, 1993) (text of Amendment No. 1152). Senator Biden's reference to "replicas and duplicates" reflects this textual difference. *See* 139 Cong. Rec. S15411–01, 15459–01. Congress's eventual decision to replace the word "replicas" with "copies" demonstrates that it intended the phrase "copies or duplicates" to encompass more than just replicas of the Enumerated Weapons.

Second, the complaint refers to an exchange of letters between then-Senator Craig and the Director of the ATF about the federal ban. *See* Compl. Exs. B–D. Senator Craig's letter asked the ATF Director whether firearms on a list he provided would be covered by the ban. Compl. Ex. B, at 1. The Director responded that "[t]he majority of the firearms contained on the enclosure in your letter would be assault weapons as that term is defined in the Feinstein amendment." Compl. Ex. C, at 1. He did not specify whether those weapons would be banned because they are "copies or duplicates" of the Enumerated Weapons or because they fail the Features Test. Separately, the Director determined that several other firearms on Senator Craig's list were "modified versions of semiautomatic rifles listed" as Enumerated Weapons. *Id.* at 2. For that reason, ATF was "uncertain of their status under the amendment." *Id.* That strongly suggests that ATF believed that "modified versions"—i.e., similar or imitation versions—of the Enumerated Weapons could be covered by

the ban because they were "copies or duplicates."

### d. The Enforcement Notice Is Consistent with Maryland's Guidance.

Finally, the Attorney General's interpretation of "copies or duplicates" is consistent with the Notice of the Maryland Attorney General, which similarly interpreted the term "copies" in Maryland's Assault Weapons Ban. *See* 95 Md. Op. Atty. Gen. 101, 2010 WL 2351491, *4 (2010). After analyzing that statute's text, purpose, and legislative history, the Maryland Attorney General concluded that "a 'copy' would include a firearm whose internal components and function, necessary to the operation of the firearm, are similar to those of one of the specifically enumerated weapons." *Id.* In rejecting a vagueness challenge to the statute, the Fourth Circuit did not question that the Attorney General's definition was consistent with the statute. *See Kolbe*, 813 F.3d at 191.

### 3. The Enforcement Notice is Not Arbitrary, Capricious, or an Abuse of Discretion.

The plaintiffs' third state-law claim contends that the Enforcement Notice is "arbitrary and capricious and an abuse of discretion or is not otherwise in accordance with the law." Compl. ¶¶ 79, 94. Even if it were not barred by the Eleventh Amendment, the claim would fail as a matter of law.

First, the plaintiffs have borrowed the "arbitrary, capricious, or abuse of discretion" standard from the Massachusetts Administrative Procedure Act, G.L. c. 30A, § 14(7). But that statute only permits state-court review of agencies' "adjudicatory proceedings." *See* G.L. c. 30A, § 14. The plaintiffs have not filed suit in state court, as is required to assert a claim under chapter 30A. *See* G.L. c. 30A, § 14(1) ("Proceedings for judicial review of an agency decision shall be instituted in the superior court."). Moreover, the plaintiffs do not seek review of an "adjudicatory proceeding." The Enforcement Notice is an advisory that explains the Attorney General's interpretation of a criminal law; it was not the product of any adjudicatory proceeding. *See id.*

§1(1) (an "adjudicatory proceeding" is one "in which the legal rights, duties or privileges of specifically named persons are required by . . . any provision of the General Laws to be determined after opportunity for an agency hearing"). For both reasons, this Court lacks authority to evaluate whether the Notice was arbitrary, capricious, or an abuse of discretion.

Second, the Enforcement Notice was the antithesis of arbitrary action. It was, instead, an example of fairness and transparency. Rather than suddenly initiate criminal prosecutions against gun dealers who sold copies of the Enumerated Weapons—as was unquestionably within her authority—the Attorney General chose instead to remind gun dealers and the public that the state Assault Weapons Ban prohibits not just the Enumerated Weapons, but also copies and duplicates thereof. That enabled the gun industry to voluntarily come into compliance with the ban. As Chief William G. Brooks, III, President of the Massachusetts Chiefs of Police Association, explained, "It is important to understand that [the] enforcement notice from Attorney General Healey is not new law, nor a new set of regulations. The Commonwealth's assault weapon statute has been in place for many years. To her credit, she has chosen to remind gun shops of the law's provisions prior to conducting inspections." Compl. Ex. J, at 1. The plaintiffs' claim that the Enforcement Notice is arbitrary or capricious should, accordingly, be dismissed.

## II.   The Plaintiffs' Vagueness Claim Is Not Cognizable and Fails as a Matter of Law.

The amended complaint next alleges that the Enforcement Notice is "too vague for a reasonable person to apply" and therefore violates the Due Process Clause of the Fourteenth Amendment. Compl. ¶¶ 75, 76, 80, 90, 91, 95. As relief, plaintiffs request a judgment declaring that the Notice is "vague on its face." *Id.*, p. 23, ¶ 2. This claim fails as a matter of law and must be dismissed. The Supreme Court has made clear that courts may not entertain claims that a statute or governmental directive is impermissibly vague on its face, because facial claims rest on

speculation and lack a concrete factual basis. The only exception to this bar is where the law threatens to chill speech protected by the First Amendment, and that is plainly not applicable here. Moreover, even if the plaintiffs could assert a facial vagueness challenge to the Enforcement Notice, it would fail on the merits.

**A.   As a Facial Challenge to the Enforcement Notice, the Vagueness Claim Necessarily Rests on Speculation and Is Therefore Not Cognizable.**

The threshold issue in reviewing the vagueness claim is whether the claim challenges the Enforcement Notice on its face or as applied to these particular plaintiffs. The answer to that question is straightforward—the plaintiffs have asserted a facial claim because their complaint seeks to invalidate the Notice "on its face" and does not challenge any particular application of the Notice in a criminal or civil proceeding. For that reason, as explained below, their vagueness claim is not cognizable and must be dismissed.

The Supreme Court recently clarified the test that determines whether a claim challenges a government action on its face or as applied. A court must examine the "plaintiffs' claim and the relief that would follow" to determine whether the claim and relief would "reach beyond the particular circumstances of th[e] plaintiffs." *John Doe No. 1. v. Reed*, 561 U.S. 186, 194 (2010). If it would, the claim must "satisfy [the Court's] standards for a facial challenge to the extent of that reach." *Id*.; *accord Showtime Entertainment, LLC v. Town of Mendon*, 769 F.3d 61, 70 (1st Cir. 2014).

Under this test, the plaintiffs have challenged the Enforcement Notice on its face. The plaintiffs' claim focuses on whether retailers in general can understand the Notice, not on whether the Notice is understandable in the context of a particular enforcement action involving the plaintiffs. *See, e.g.*, Compl. ¶¶ 52 (the Notice is "too vague for retailers, distributors, and manufacturers to understand"); 76, 91 (the Notice is "too vague for a reasonable person to apply");

27

80, 95 (the Notice is "too vague for retailers to understand"). And the relief the plaintiffs seek—"a permanent injunction enjoining the . . . Attorney General from enforcing the Enforcement Notice and its definition of copy or duplicate," Compl., p. 24, ¶ 6—would "reach beyond the particular circumstances of th[e] plaintiffs," as it would apply to everyone affected by the Notice. *John Doe No. 1*, 561 U.S. at 194.  It is, therefore, a facial claim. *Id.*

Moreover, because the "plaintiffs complain about the threat of enforcement, but not any particular instances of enforcement," their claim is a "facial challenge." *Gun Owners' Action League v. Swift*, 284 F.3d 198, 205 (1st Cir. 2002). The amended complaint does not allege, nor could it, that the Attorney General has filed any enforcement actions since she issued the Enforcement Notice.  Instead, the plaintiffs allege only a "fear of being prosecuted." Compl. ¶¶ 68–71.  Because they complain only about the possibility of enforcement, their claim can only be a facial challenge to the Notice.

It is of no moment that the amended complaint requests a declaration that the Notice is unconstitutionally vague "as applied" to various types and models of assault weapons, Compl., p. 23, ¶1, because "[t]he label is not what matters." *John Doe No. 1*, 561 U.S. at 194. The plaintiffs do not allege that the Notice has been, or imminently will be, applied against them in an enforcement action: they merely assert that the phrase "substantially similar" is "too vague" for them "to apply" to determine whether certain weapons are copies. Compl. ¶¶ 77, 78, 82, 83. These new allegations do not create an as-applied claim, the gravamen of which is enforcement by the government.  *See, e.g., McGuire v. Reilly*, 386 F.3d 45, 64 (1st Cir. 2004) (as applied challenge "must, logically, be aimed at past [police] conduct; we cannot speculate as to future enforcement patterns"). What is key is that the amended complaint seeks a declaration that the Notice is "unconstitutionally vague on its face" and a permanent injunction barring its use. Compl., p. 23,

¶¶ 2, 6.  It therefore raises only a facial claim because it requests relief that would reach "beyond the particular circumstances of these plaintiffs." *John Doe No. 1*, 561 U.S. at 194. *See Showtime Entertainment*, 769 F.3d at 70 (facial claim presented where plaintiff "sought invalidation of the zoning bylaws, not merely a change in their application to Showtime").[12]

As a facial challenge, the vagueness claim should be dismissed. Facial challenges to government actions are disfavored because they "rest on speculation" and "raise the risk of 'premature interpretation . . . on the basis of factually barebones records.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). These concerns are heightened when a plaintiff asserts, outside the context of an enforcement action, that a law or directive is impermissibly vague on its face. Such claims force a court to reason based on hypotheticals and "sheer speculation," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 25 (2010), a form of analysis that "run[s] contrary to the fundamental principle of judicial restraint," *Washington State Grange*, 552 U.S. at 450.

Because of these concerns, the Supreme Court has crafted special rules for claims challenging a law or directive as unconstitutionally vague on its face. When vagueness is raised courts only determine whether parties who were prosecuted "*in fact* had fair notice that [a] statute [or] regulations proscribed their conduct." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013) (internal citation and quotation omitted) (emphasis in original). Under this limitation courts do not entertain pre-enforcement claims that a law is impermissibly vague on its face. "Outside the First Amendment context," courts only "consider 'whether a statute is vague as applied to *the particular facts at issue*.'" *Id.* (quoting *Humanitarian Law Project*, 561 U.S. at 18) (emphasis in

---

[12] Even the more limited declaration that the plaintiffs also seek—that the Notice is impermissibly vague as to various types and models of assault weapons—would still benefit other sellers of those models and thus extend "beyond the particular circumstances of these plaintiffs." *John Doe No. 1*, 561 U.S. at 194 (claim that public records law violated the First Amendment "as applied to referendum petitions" was nonetheless a facial challenge).

original); *see also Chapman v. United States*, 500 U.S. 453, 467 (1991) ("the vagueness claim must be evaluated as the statute is applied to the facts of this case"); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 7 (1982) (vagueness claims that "'do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand'") (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)). [13]

Applying this rule, the First Circuit held recently that a claim alleging that a handgun safety regulation was "vague in violation of due process" was "eligible only for as-applied, not facial, review." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016). Earlier circuit cases are in accord. *See Love v. Butler*, 952 F.2d 10, 13 (1st Cir. 1991). Here, the plaintiffs have not asserted an as-applied vagueness claim—nor could they, as the Enforcement Notice has not been applied to them in an enforcement action. Accordingly, plaintiffs' vagueness claim is not cognizable and must be dismissed.

B.  **Even If the Plaintiffs Could Assert a Facial Vagueness Claim, It Would Fail Because the Enforcement Notice is Not Vague in All of its Applications and Has a Plainly Legitimate Sweep.**

Even if the plaintiffs could challenge the Enforcement Notice as unconstitutionally vague on its face, which they cannot, their claim would still fail as a matter of law. In such a claim, plaintiffs would have to show that the Notice "fails to provide a person of ordinary intelligence fair notice of what is prohibited" under the Assault Weapons Ban. *United States v. Williams*, 553 U.S. 285, 304 (2008). Moreover, to succeed on a facial claim, "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 498; *accord Cutting v. Portland*, 802 F.3d 79, 86 (1st Cir. 2015) ("Outside the First Amendment context, . . . a litigant who brings a facial challenge to a statute must establish 'that [there is] no

---

[13]   The plaintiffs' claim does not implicate the First Amendment; the plaintiffs do not contend, nor could they, that the Enforcement Notice threatens to chill protected speech or expression.

set of circumstances . . . under which [the regulation] would be valid.'" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))). In discussing facial claims in general, the Supreme Court has also stated that such claims fail when a statute or regulation has a "'plainly legitimate sweep.'" *Washington State Grange*, 552 U.S. at 449 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739–40 & n.7 (1997) (Stevens, J., concurring in judgments)). Under either standard, the Enforcement Notice easily passes constitutional muster.

Under the Similarity Test, "[a] weapon is a Copy or Duplicate if its internal functional components are substantially similar in construction and configuration to those of an Enumerated Weapon." Compl. Ex. G, at 3. And under the Interchangeability Test, "[a] weapon is a Copy or Duplicate if it has a receiver that is the same as or interchangeable with the receiver of an Enumerated Weapon. A receiver will be treated as the same as or interchangeable with the receiver of an Enumerated Weapon if it includes or accepts two or more operating components that are the same as or interchangeable with those of an Enumerated Weapon." *Id.* at 4.

It is clear that there are plainly legitimate applications of these tests. The plaintiffs do not contest, for example, that an exact replica of a Colt AR-15 that has been renamed, but otherwise has the same receiver and internal functional components as the Colt AR-15, would be a copy or duplicate. *See* Compl. ¶ 35. If so, that weapon would be covered by both tests, because its internal functional components would be substantially similar in construction and configuration to those of a Colt AR-15, and because its receiver would be interchangeable with the Colt AR-15 receiver. Moreover, the complaint itself concedes that there are clear applications of the tests. For example, the plaintiffs allege that the MK 14 EBR "would not pass the substantially similar or interchangeability tests issued under the Enforcement Notice." Compl. ¶ 65. It also alleges that the Beretta CX4 Storm and the Kel-Tech Sub 2000 "would not meet the interchangeability test under

31

the Enforcement Notice." Compl. ¶ 62. Because the complaint acknowledges the straightforward application of the tests to certain weapons, the plaintiffs have conceded that the tests are not impermissibly vague in all of their applications.

To be sure, the plaintiffs speculate that, if the Similarity Test is "broadly interpreted" to include weapons that operate on common "physics principles," it would be "uncertain" whether certain firearm models would be a "copy" of an Enumerated Weapon. Compl. ¶¶ 59, 62. The Attorney General has not, however, advanced that broad interpretation; and the Court need not, in a facial challenge, "speculat[e] about possible vagueness in hypothetical situations not before the Court." *Hill v. Colorado*, 530 U.S. 703, 733 (2000). Here, there are many plainly valid applications of the Notice—to copies of Enumerated Weapons with minor adjustments that still have internal functional components that are substantially similar in construction and configuration to those of an Enumerated Weapon, or that have a receiver that is interchangeable with that of an Enumerated Weapon. For that reason, the facial attack on the Enforcement Notice must fail. *Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 684 (2d Cir. 1996) (vagueness challenge failed when "it [wa]s obvious . . . that there exist[ed] numerous conceivably valid applications of" an assault weapons ban).[14]

Even if this Court examined the language of the tests more specifically, which it need not, the claim would still fail as a matter of law. In assessing vagueness claims, "meticulous specificity" and "mathematical certainty" are not required of government enactments, *Grayned v. City of Rockland*, 408 U.S. 104, 110 (1972), for "words are rough-hewn tools, not surgically precise

---

[14]   Moreover, the allegations in the Complaint that the AGO provided inconsistent direction to the public are anecdotal and taken out of context. Compl. ¶¶ 43-51, 60, 63, 65.  Among other things, the plaintiffs allege that the AGO is creating "uncertainty" by publicly *agreeing* with their position that a certain weapon would meet neither test in the Enforcement Notice. Compl. ¶ 65. If nothing else, the allegations demonstrate that the AGO is responding in good faith to inquiries over a period of time to help clarify the tests for gunsellers, if clarification is necessary. *See Gun Owners' Action League*, 284 F.3d at 209 (facial vagueness challenge not ripe, in part, because "continuing administrative clarification of the Act reduces uncertainty").

instruments," *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011). Accordingly, "'reasonable breadth' in the terms employed by an [enactment] does not require that it be invalidated on vagueness grounds." *Id.* (quoting *Grayned*, 408 U.S. at 110).

With respect to the Similarity Test, the plaintiffs primarily object to the phrase "substantially similar." *See* Compl. ¶ 54. But courts have repeatedly rejected vagueness challenges to statutes that likewise use the phrase "substantially similar." *See, e.g.*, *United States v. Turcotte*, 405 F.3d 515, 531–33 (7th Cir. 2004) (rejecting challenge to law that criminalizes the distribution of a controlled substance, "the chemical structure of which is <u>substantially similar</u> to the chemical structure of a controlled substance in schedule I or II" (emphasis added)); *United States v. Ansaldi*, 372 F.3d 118 (2d Cir. 2004) (same); *United States v. Orchard*, 332 F.3d 1133 (8th Cir. 2003) (same); *United States v. Fisher*, 289 F.3d 1329, 1339 (11th Cir. 2002) (same). That phrase, moreover, appears throughout the Massachusetts General Laws in diverse contexts. *See, e.g.*, G.L. c. 7, §§ 53, 54 (Pacheco Law); G.L. c. 94C, § 1 (State Controlled Substances Analogue Act); G.L. c. 93, § 82 (statute governing health club contracts); G.L. c. 209D, §§ 1–101, 2–205 (Uniform Interstate Family Support Act). Invalidation of the Similarity Test on vagueness grounds would threaten countless statutes and would conflict with precedent upholding similarly-worded enactments. *See, e.g.*, *URI Student Senate*, 631 F.3d at 13–15 (upholding phrases "substantial disturbance" and "significant segment of a neighborhood").

With respect to the Interchangeability Test, the plaintiffs do not allege that any particular word or phrase is unconstitutionally vague. And for good reason. Courts readily uphold enactments with wording similar to "interchangeable," "operating components," and the other key phrases in the test. *See, e.g.*, *Draper*, 827 F.3d at 4–5 (upholding phrase "<u>device</u> which plainly indicates" (emphasis added)); *United States v. Lachman*, 387 F.3d 42, 45 (1st Cir. 2004) (upholding

33

regulation that required license for export of "specially designed . . . components" of equipment used in constructing rockets (emphasis added)). And those phrases likewise appear throughout the Massachusetts General Laws. *See, e.g.*, G.L. c. 17, § 13 (the Drug Formulary Commission "shall prepare a drug formulary of interchangeable drug products"); G.L. c. 159, § 18 ("common carriers shall be permitted . . . to issue . . . joint interchangeable mileage tickets").

Finally, the Similarity and Interchangeability Tests both provide examples of their application. The Similarity Test explains that "a weapon is a Copy or Duplicate, for example, if the operating system and firing mechanism of the weapon are based on or otherwise substantially similar to one of the Enumerated Weapons." Compl. Ex. G, at 3. That clarifies that the "internal functional components" referred to in the test may include the weapon's operating system and firing mechanism. Similarly, the Interchangeability Test provides examples of the "operating components" referred to in the test: "Such operating components may include, but are not limited to: 1) the trigger assembly; 2) the bolt carrier or bolt carrier group; 3) the charging handle; 4) the extractor or extractor assembly; or 5) the magazine port." *Id.* at 4. Both examples enhance the clarity of the tests and provide additional guidance to gun owners and dealers regarding the Attorney General's interpretation of "copies or duplicates." *See United States v. Posters N Things Ltd.*, 969 F.2d 652, 660 (8th Cir. 1992) (statute prohibiting the sale of "drug paraphernalia" that listed examples of prohibited items not unconstitutionally vague); *United States v. Sun & Sand Imports, Ltd., Inc.*, 725 F.2d 184, 187 (2d Cir. 1984) (statute prohibiting importation of flammable "children's sleepwear" not unconstitutionally vague, particularly when agency had published administrative guidance providing examples of children's sleepwear).

III.   **The Plaintiffs' Contingent Second Amendment Claim Must Be Dismissed.**

The plaintiffs' final claim invokes the Second Amendment, but is expressly conditioned

on a hypothetical and artificially broad reading of the phrase "substantially similar" in the Notice. Because this interpretation is not advanced or embraced by the Attorney General, and is contrary to the plain meaning of the Notice, the Second Amendment claim should be dismissed. In addition, the complaint fails to state a cognizable claim because it does not allege that the Notice violates the Second Amendment by imposing an impermissible burden on the right to possess a firearm articulated in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

> **A.** **The Second Amendment Claim Does Not Present a Justiciable Case or Controversy Because It Is Based on a Hypothetical and Incorrect Reading of the Enforcement Notice.**

The plaintiffs frame their Second Amendment claim as arising *only* if the Similarity Test were to apply "commonality in physics principles" to determine whether a weapon is "substantially similar" to an Enumerated Weapon. Compl. ¶¶ 53-56. The concept of "commonality in physics principles" originates in the plaintiffs' complaint; it is not stated or suggested in the Notice, which provides that "[a] weapon is a Copy or Duplicate if its internal functional components are substantially similar in construction and configuration to those of an Enumerated Weapon." Compl. Ex. G. Nonetheless, the plaintiffs allege that "*if* the phrase 'substantially similar' refers to commonality in physics principles, then virtually all semiautomatic firearms are substantially similar to the enumerated weapons. *In that event*, the Enforcement Notice effectively bans all semi-automatic firearms with the exception of the listed exempt weapons." Compl. ¶ 54 (emphases added). The plaintiffs then assert: "If the Attorney General's Enforcement Notice is broadly interpreted, it applies to all semiautomatic firearms not otherwise specifically exempted by G.L. c. 140. If that is a correct reading . . . then the Enforcement Notice violate[s] the Second [Amendment]." *Id.* ¶ 55; *see also* Compl. ¶¶ 84, 99. The plaintiffs concede, however, that there is a narrower construction of "substantially similar" that would encompass fewer weapons; they do

not contend that the narrower reading would violate the Second Amendment. Compl. ¶ 56.

The plaintiffs' Second Amendment claim is not justiciable because it explicitly rests on a hypothetical (and implausible) interpretation of the Notice. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). The plaintiffs do not create an actual controversy by imagining an expansive interpretation of the Similarity Test, not advanced by the Attorney General, and then asking the Court to rule that their interpretation, "if it is correct," would violate the Second Amendment. On such a claim, plaintiffs cannot demonstrate "injury in fact" sufficient to support standing to sue. *Clapper v. Amnesty International USA*, 133 S. Ct. 1138, 1147 (2013) ("allegations of *possible* future injury are not sufficient" for standing) (emphasis in opinion); *Kerin v. Titeflex Corp.*, 770 F.3d 976, 981 (1st Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 554 U.S. 555, 560-61 (1992) (standing requires an injury that is "actual or imminent, not conjectural or hypothetical")). And, at a minimum, the Second Amendment claim is premature, and thus not ripe. *City of Fall River v. F.E.R.C.*, 507 F.3d 1, 6 (1st Cir. 2007) ("[A] 'claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (quoting *Texas v. United States,* 523 U.S. 296, 300 (1998)). These jurisdictional requirements are especially significant here because courts should not decide important constitutional questions unless "absolutely necessary." *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 494 (1st Cir. 1992). Accordingly, the Second Amendment claim must be dismissed.

The plaintiffs also fail to state a cognizable Second Amendment claim because the Enforcement Notice cannot be read as applying to "all semiautomatic firearms not otherwise

specifically exempted by G.L. c. 140." Compl. ¶ 55.[15] The Notice only interprets the phrase "copies or duplicates" in the Massachusetts Assault Weapons Ban, G.L. c. 140, § 121. *See* Compl. Ex. G. It does not expand on the statute, nor could it; and it cannot sweep in weapons that are beyond the scope of the ban. Indeed, the Notice was issued to help gun dealers identify—in addition to assault weapons that are expressly exempt—weapons that are, and are not, "'copies' or 'duplicates' of the enumerated Assault weapons that are banned under Massachusetts law." Compl. Ex. G. Under the Notice "a semiautomatic rifle or handgun" that can "accept a detachable magazine" is *not* a copy or duplicate of an Enumerated Weapon unless it meets one or both of the Similarity or Interchangeability Tests. *Id.* It is therefore plain that the Notice should not be read as applying to *all* semiautomatic weapons that are not expressly exempt under the statute.[16] Because the plaintiffs' Second Amendment claim is contingent on that impossible reading of the Enforcement Notice, it fails to state a claim and must be dismissed.

### B. The Enforcement Notice Does Not Implicate the Second Amendment Because It Imposes, at Most, a *De Minimis* Burden on the Right to Possess a Firearm in the Home for Self-Defense.

The Second Amendment claim must also be dismissed because the Enforcement Notice

---

[15]   As explained above, the Assault Weapons Ban exempts several categories of semiautomatic firearms. *See supra*, at 6. The statute provides that "the term assault weapon shall not include: (i) any of the weapons, or replicas or duplicates of such weapons, specified in appendix A to 18 U.S.C. section 922[;] . . . (vi) any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition; or (vii) any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine." G.L. c. 140, § 121. Clauses (vi) and (vii) expressly exempt certain types of semiautomatic weapons from the ban. And Appendix A likewise expressly exempts many semiautomatic weapons, listed on the appendix as "autoloaders." *See supra*, at 4, 6; Pub. L. No. 103–322, § 110102(a); 108 Stat. at 2000–10. Moreover, the Assault Weapons Ban only applies to assault weapons "not otherwise lawfully possessed on September 13, 1994." G.L. c. 140, § 131M. Any semiautomatic weapons lawfully possessed before September 13, 1994, therefore, are also exempted from the ban. *Id.*

[16] Moreover, the Attorney General has clarified the scope of the Notice on documents posted on the AGO website. One of those documents lists "Guns That Are Not Assault Weapons," and includes several semiautomatic weapons. *See* Compl. Ex. I; *see also* Compl. Ex. A, at 2. Similarly, the Questions & Answers section of the AGO website clarifies that "[t]he Enforcement Notice makes no change to the list of handguns, including semi-automatic pistols, on the August 2016 version of the state's Approved Firearms Roster." Compl. Ex. A, at 2.

does not burden rights protected by the Second Amendment. The Supreme Court held in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), that the Second Amendment secures a limited right, incorporated against the States, for law-abiding, responsible citizens to possess a firearm in the home for self-defense. Since *Heller*, many courts have concluded that government actions that do not substantially burden Second Amendment rights, or that impose only *de minimis* burdens, do not give rise to viable Second Amendment claims and therefore do not merit heightened scrutiny. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 259 (2d Cir. 2015) ("*NYSRPA*"); *Heller v. District of Columbia*, 801 F.3d 264, 273–74 (D.C. Cir. 2015); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012); *United States v. DeCastro*, 682 F.3d 160, 166 (2d Cir. 2012); *Commonwealth v. McGowan*, 464 Mass. 232, 239 (2013). More specifically, if a government action leaves "'adequate alternatives . . . for law-abiding citizens to acquire a firearm for self-defense,'" no substantial burden on Second Amendment rights exists and any Second Amendment challenge to the regulation must fail. *NYSRPA*, 804 F.3d at 259 (quoting *DeCastro*, 682 F.3d at 168).

Importantly, the plaintiffs here only contend that the Enforcement Notice <u>itself</u> violates the Second Amendment; they do not contend that the Massachusetts Assault Weapons Ban violates the Second Amendment. *See* Compl. ¶¶ 84, 99. Thus, the only question for this Court is whether the Notice's clarification of the statutory phrase "copies or duplicates" burdens Second Amendment rights to an extent that it gives rise to a viable claim.

The answer to that question is no, because if the Enforcement Notice interprets the state Assault Weapons Ban in a way that burdens Second Amendment rights, the burden is insubstantial. At most, the Notice applies only to the narrow class of weapons that are "copies or duplicates" of the Enumerated Weapons. *See* Compl. Ex. G. It has no effect whatsoever on the thousands of

firearms, rifles, and shotguns that are not assault weapons, either because they are specifically exempted from the state Assault Weapons Ban, because they were manufactured before September 13, 1994, or because they are not Enumerated Weapons or copies or duplicates thereof. For example, as the Attorney General has made clear, "[t]he Enforcement Notice makes no change to the list of handguns, including semi-automatic pistols, on the August 2016 version of the state's Approved Firearms Roster." Compl. Ex. A, at 2.

Consequently, notwithstanding the Enforcement Notice, the plaintiffs retain access to a wide range of alternative firearms as permitted by state law. The Notice, therefore, imposes no substantial burden on Second Amendment rights, and the plaintiffs' contingent Second Amendment claim must be dismissed. *See Heller*, 554 U.S. at 626 (Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"); *Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015) (upholding ordinance banning assault weapons in part because it "leaves residents . . . ample means to exercise the 'inherent right of self-defense' that the Second Amendment protects").

**CONCLUSION**

For the foregoing reasons, the amended complaint should be dismissed.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

 /s/ William W. Porter
William W. Porter, BBO #542207
Julia E. Kobick, BBO #680194
Gary Klein, BBO #560769
Thomas Bocian, BBO #678307
Assistant Attorneys General
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108
(617) 963-2976
Date: January 10, 2017                    bill.porter@state.ma.us

**CERTIFICATE OF SERVICE**

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 10, 2017.

/s/ William W. Porter
William W. Porter
Assistant Attorney General