UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE NO.: 4:16-cv-40136-TJH

———————————————————————
                                                                    )
PULLMAN ARMS INC, GUNS and GEAR, LLC,   )
PAPER CITY FIREARMS, LLC,                            )
GRRR! GEAR, INC, and                                     )
NATIONAL SHOOTING SPORTS                        )
FOUNDATION, INC.                                          )
                                                                    )
                                                                    )
                      Plaintiffs,                              )
                                                                    )
v.                                                                 )
                                                                    )
                                                                    )
MAURA HEALEY, ATTORNEY GENERAL          )
FOR THE COMMONWEALTH OF                     )
MASSACHUSETTS                                          )
                                                                    )
                      Defendant.                            )
———————————————————————)

**PLAINTIFFS' OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

On July 20, 2016, the Attorney General issued a sweeping new regulation which, in vague terms, made illegal firearms that had been sold legally for decades. The Plaintiffs, four lawful retailers and their trade association, ask this Court to find the regulation unconstitutionally vague, both on its face and as applied to a number of specific firearms these Plaintiffs stopped selling for fear of prosecution. In addition, the regulation is in excess of her authority, and in the alternative, unduly burdens the Second Amendment right to bear arms.

Referring to extraneous matters outside of the Amended Complaint and failing to address the principal claim that the Enforcement Notice is unconstitutionally vague as applied to specific firearms the Plaintiffs stopped selling, the Defendant Attorney General seeks dismissal of the

entire complaint, arguing that the Plaintiffs cannot bring a facial vagueness challenge and that the 11th Amendment bars other state law claims. The Motion to Dismiss should be denied when the Amended Complaint demonstrates how the Plaintiff retail stores cannot understand the scope of the Notice as applied to specific firearms.  The Enforcement Notice is therefore unconstitutionally vague as applied, and the Eleventh Amendment does not bar the meritorious state law claims.

## FACTUAL BACKGROUND AS ALLEGED IN THE COMPLAINT

### Introduction

Throughout the Memorandum in Support of her Motion to Dismiss (the "Defendant's Memo"), the Attorney General ignores the well-known rule of accepting the Amended Complaint's allegations as true.  Drawing from several sources including media reports, the Attorney General provides her own "facts" regarding the legislative history for the state and federal assault weapons statutes.  The Attorney General then ignores the allegations concerning how the Enforcement Notice language is confusing to apply to specific firearms formerly sold by the retailers.  Instead, she devotes all of six summary sentences in her 40 page memorandum to what is actually pled in the Complaint.  (See pp.9-10 of Memorandum of Attorney General Healey in Support of Motion to Dismiss).  The Attorney General's version of the "relevant" factual background is not relevant and does not address the fundamental flaws in the Enforcement Notice identified in the Complaint.

### Genesis of Federal "Assault Weapon" Ban

In 1994, Congress first passed the limited federal assault weapon ban, contained in the Public Safety and Recreational Firearms Use Protection Act, which amended the Gun Control Act.  (Amended Complaint, ¶20).  The 1994 amendment prohibited for a 10 year period the

manufacture, transfer, or possession of so-called "assault weapons" as defined by the statute. (*Id*, ¶20). [1]

The 1994 federal legislation was not a broad ban on semi-automatic firearms based on how the firearms operated or functioned or their similarity to other firearms. (*Id*, ¶21). Instead, the statute amended 18 U.S.C. §921 (a)(30) to include a short list of specifically identified semi-automatic firearms and exact "copies and duplicates" of those listed firearms, along with other semiautomatic firearms based on whether they had two or more features. (*Id*, ¶21). The specifically enumerated firearms included the Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models); UZIs Beretta Ar70 (SC-70); and Colt AR-15, along with other specific, enumerated firearms. (*Id*, ¶22). These specifically banned "assault weapons" became known as "enumerated" firearms. (*Id*, ¶23).

In addition to the specific firearms and copies or duplicate of those firearms, the federal legislation also banned as an "assault weapon" any semiautomatic rifle, pistol, or shotgun that failed what became known as the "features" test. (*Id*, ¶23). Under this test, a rifle is a so-called "assault weapon" if it has the ability to accept a detachable magazine and has at least two of these features: a folding or telescoping stock; a pistol grip that protrudes conspicuously beneath the action of the weapon; a bayonet mount; a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and a grenade launcher. (*Id*, ¶23). Similarly, the statute included within the definition of assault weapon a semiautomatic pistol that has the ability to accept a detachable magazine and has at least two of the following features: an ammunition magazine that attaches to the pistol outside of the pistol grip; a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip or silencer; a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold

---

[1] The term "assault weapon" is a statutory creation and has no technical meaning to firearm designers and engineers.

the firearm with the non-trigger hand without being burned; a manufactured weight of 50 ounces or more when the pistol is unloaded; and a semiautomatic version of an automatic firearm. (*Id*, ¶24). Congress also included certain semiautomatic shotguns within the definition of "assault weapons" if they have at least 2 of the following features: a folding or telescoping stock; a pistol grip that protrudes conspicuously beneath the action of the weapon; a fixed magazine capacity in excess of 5 rounds; and an ability to accept a detachable magazine. [2] (*Id*, ¶25).

### Legislative History Confirms the Scope of the Statute

The Public Safety and Recreational Firearms Use Protection Act did not contain, and was never interpreted to include, a "similarity" test or "interchangeability" test to define what constitutes an "assault weapon," and the statute's legislative history confirms this. (*Id*, ¶27-¶28). As the pending amendment, introduced by Senator Feinstein, was being considered and debated, Senator Larry Craig of Idaho wrote John Magaw, the Director of the Bureau of Alcohol Tobacco and Firearms ("ATF"), asking if a firearms list would be banned under the Feinstein amendment. (*Id*, ¶28 and letter attached as Exhibit B).

In response, Director Magaw wrote Senator Craig and listed five firearm models which would not be assault weapons, including the Commando Arms Carbine, the Feather Saturn 30 Rifle, the F.I.E./Franchi Paracarbine the Heckler Koch VP 70Z Pistol and the Valmet Hunter Rifle. (*Id*, ¶29 and response letter attached as Exhibit C). Those firearms all have operating systems based on various enumerated weapons, but they lack the specific features enumerated in the features test. (*Id*, ¶29).

ATF Director Magaw also noted that the vast majority of semiautomatic firearms on the list would be considered banned firearms. (*Id*, ¶30). However, ATF Director Magaw stated that

---

[2] The federal statute exempted certain firearms from the assault weapon ban, including a list of firearms appearing as appendix A to the statute.

"virtually any firearm on the list of assault weapons could be modified" to remove the assault weapon features such as the bayonet lug or the flash suppressor, and therefore, remove them from the definition of "assault weapon."  (*Id*, ¶30 and Compl. Ex. C).  This is compelling evidence that other than the enumerated firearms, the features were the determinant: nowhere in his response did Director Magaw mention that the term "copies" referred to similar operating systems or interchangeability of components.  (*Id*, ¶30 and Congressional record attached as Compl. Ex. D).  For over two decades, since the federal statute was enacted in 1994, the ATF and federal law enforcement have universally interpreted the law to mean that only firearms meeting the features test and the specifically enumerated firearms constituted banned assault weapons. (*Id*, ¶ 39).

### Massachusetts Adopts the Federal Assault Weapon Definitions

Massachusetts regulates firearms sales through several means, including requiring licenses for firearms retailers in G.L. c. 140 §§ 122 and 123 *et seq.* (*Id*, ¶33).[3]  In 1998, Massachusetts considered whether to amend G.L. c. 140 to adopt the federal so-called assault weapons ban.  (*Id,* ¶33).

As it considered amending G.L. c. 140, the Massachusetts Legislature considered and rejected an amendment to define the term "copy," which contained virtually identical language to that now employed by the Attorney General in the Enforcement Notice.  (*Id*, ¶34).  The amendment defined the term "copy" as follows:

> any weapon model with the same bolt and receiver or bolt and receiver design, regardless of nomenclature or manufacturer, as any weapon designated as an "assault weapon" in this section or with a bolt and receiver design identical or nearly identical, regardless of nomenclature or manufacturer, to any designated weapon which has been redesigned from, renamed, renumbered or patterned after any such designated weapon,

---

[3] G. L. c. 140 §131M imposes criminal penalties upon licensed retailers for violations of the firearms restrictions in G.L. c. 140 §121. (*Id.*, ¶37).

regardless of the manufacturer or country of origin; provided, however, that the weapon as modified, enhanced, redesigned, renamed, renumbered, or patterned employs only ammunition of more than .22 caliber rimfire.

Rather than use this language, the Legislature incorporated the assault weapon definitions appearing in 18 U.S.C. §921(a)(30).  (*Id,* ¶35).  The Massachusetts Legislature amended G.L. c. 140 to provide that the term "assault weapon" shall have the same meaning as defined in 18 U.S.C. §921(a)(30) by including the enumerated firearms from 18 U.S.C. §921(a)(30) such as AK models, Israeli made UZIs, and Colt AR-15's, and copies or duplicates of the enumerated weapons, without any reference to copies consisting of similar firearms with identical or nearly identical receivers and bolts.  (*Id*, ¶35).

Massachusetts law enforcement officials, including all prior state Attorneys General, have consistently and correctly interpreted G.L. c. 140 §121 narrowly.  For nearly two decades, since the 1998 Massachusetts law, firearms manufacturers, Massachusetts' firearms retailers and law enforcement authorities, including the Executive Office of Public Safety, which has approved and registered all firearm transactions, have universally interpreted G.L. c. 140 §121 to mean that only firearms meeting the features test and the specifically enumerated firearms constituted banned assault weapons.  (*Id*, ¶39).  No prior Massachusetts Attorney General has, while in office, given any indication that this well-accepted interpretation was in any way incorrect.  (*Id*).

After eighteen years of consistent interpretation and application, on July 20, 2016, the Attorney General suddenly and unexpectedly issued an "Enforcement Notice" indicating that she intended to enforce a criminal licensing statute utilizing a new and vastly expanded definition for "assault weapon."  (*Id*, ¶40; *see also* July 20, 2016 press release at Compl., Ex. J; July 20, 2016 op-ed by Ms. Healey, Compl., Ex. K; and July 20, 2016 remarks delivered by Ms. Healey,

Compl., Ex. L).  Without receiving any input from affected parties, the Attorney General's Enforcement Notice for the first time adopted an entirely new interpretation of the "assault weapon" definition that is not in conformity with the statutory test, nor with the legislative history or intent.  (*Id*, ¶¶40-41).

The Enforcement Notice purportedly sought to clarify what was meant by copies or duplicates of the banned enumerated assault weapons under Massachusetts law.  (*Id,* ¶42, and Enforcement Notice attached as Exhibit G).  It stated that a firearm is a "Copy or Duplicate and is therefore a prohibited Assault weapon if it meets one or both of the following tests and is 1) a semiautomatic rifle or handgun that was manufactured or subsequently configured with an ability to accept a detachable magazine, or 2) a semiautomatic shotgun."  (*Id*, ¶42).

The Enforcement Notice established two new tests, the Similarity Test and the Interchangeability Test, to determine if a firearm is a copy or duplicate of an enumerated firearm.  (*Id*, ¶42).  According to the Similarity Test, a weapon is a Copy or Duplicate if its "internal functional components are substantially similar in construction and configuration to those of an enumerated weapon. Under this test, a weapon is a Copy or Duplicate, for example, if the operating system and firing mechanism of the weapon are based on or otherwise substantially similar to one of the Enumerated Weapons."  (*Id*, ¶42).   The Interchangeability Test is defined as follows:

> *Interchangeability Test*: A weapon is a Copy or Duplicate if it has a receiver that is the same as or interchangeable with the receiver of an Enumerated Weapon. A receiver will be treated as the same as or interchangeable with the receiver on an Enumerated Weapon if it includes or accepts two or more operating components that are the same as or interchangeable with those of an Enumerated Weapon. Such operating components may include, but are not limited to: 1) the trigger assembly; 2) the bolt carrier or bolt carrier group; 3) the charging handle; 4) the extractor or extractor assembly; or 5) the magazine port.

**Retailers Cannot Understand the Notice or the Attorney General's Efforts
to Clarify its Scope.**

The Complaint describes in detail how and why the two tests in the Enforcement Notice
are too vague for retailers, distributors, and manufacturers to understand.  The Notice does not
adequately define the phrase "operating system and firing mechanism of the weapon" are "based
on or otherwise substantially similar to one of the Enumerated Weapons" to allow retailers to
determine which firearms are prohibited.  (*Id*, ¶52).  One confusing aspect of the Enforcement
Notices arises because the enumerated firearms employ similar, basic operating technologies
used in most semiautomatic firearms manufactured today, including what is known as gas
impingement, gas piston, and blow back.  (*Id*, ¶53).  Even if the parts utilized in their systems are
different, to many firearm engineers and designers, most gas impingement systems are similar to
each other; most gas piston systems are similar to each other; and most blow back systems are
similar to each other, at least in terms of the physics principles utilized in their design. (*Id*, ¶53).

As a result, although undefined, if the phrase "substantially similar" refers to
commonality in physics principles, then virtually all semiautomatic firearms are substantially
similar to the enumerated weapons.  (*Id,* ¶54).  In that event, the Enforcement Notice effectively
bans all semi-automatic firearms with the exception of the listed, exempt weapons.  (*Id*, ¶54).
However, the phrase "operating system and firing mechanism" being "based on" or
"substantially similar" to the enumerated weapons could also refer to commonality of design
details.  (*Id,* ¶56).  If that is the interpretation of the Enforcement Notice intended by the Office
of the Attorney General, only firearms designs that have interchangeable parts while maintaining
functionality would be substantially similar to each other.  (*Id,* ¶56).

The vague terms create confusion for the regulated retailers concerning what firearms
may be lawfully sold by them.  (*Id*, ¶57).  For example, the modern bullpup IWI Tavor, the Kel-

8

Tec RFB, and the FN PS90 are rifle models that can be sold without a threaded muzzle or flash suppressor and do not meet the criteria of being an assault weapon under the interchangeability test. [4]  (*Id*, ¶59).  The design operating systems for the TWI Tavor, Kel-Tech and FN PS90 are not substantially similar to enumerated weapons in their design details and interchangeability of parts.  (*Id*, ¶59).  The retailers are faced with uncertainty, though, over whether these firearms should be classified as a "copy" of the enumerated weapons under the substantially similar test if that test is broadly interpreted to include commonality in physics principles.  (*Id*, ¶59).

To attempt to clarify the implicitly admitted ambiguities created by the Enforcement Notice, the Attorney General has issued subsequent notices, which have included information in the form of questions and answers.  Unfortunately, these efforts have not had their intended effect and have only added to the uncertainties facing retailers when deciding what firearms they may lawfully sell under the Attorney General's new interpretation.

For example, in August 2016, the Office of the Attorney General issued its first follow-up notice entitled "Guns That Are Not Assault Weapons," and this notice only furthered retailers' confusion.  (*Id*, ¶43).  The first version of this notice, which appeared in the form of questions and answers on or about August 18, 2016, listed various firearms models which were stated not to be assault weapons.  These included handguns appearing on the Executive Office of Public Safety's handgun roster, <u>any</u> .22 caliber rifle, any Ruger Mini 14, any weapon that is operated by a manual bolt, pump, lever or slide action, and antiques and relics, among other exempted firearms.  (*Id*, ¶43, and notice as Exhibit H).[5]

---

[4] A bullpup firearm has its receiver/action located behind the trigger group.  Bullpup firearms tend to house the receiver/action in the butt of the stock, effectively shortening the overall length of the firearm.  (*Id*, ¶58).

[5] This "Guns That Are Not Assault Weapon" notice, with only a couple of exceptions, simply lists the models exempt from the assault weapon ban as appended to the original federal statute in 18 U.S.C. §921(a)(30) and other exemptions incorporated into M.G.L. c. 140.

Retailers could not understand this effort to clarify the Enforcement Notice because many of the most popular models of semiautomatic rifles manufactured and sold are chambered for .223 Remington caliber centerfire ammunition, which has a bullet diameter of .223 inches.  (*Id*, ¶45).  Under the Attorney General's Enforcement Notice, many of these popular and commonly owned rifles appear to be banned under one or more of the Attorney General's new tests.  (*Id*, ¶45).  However, according to the August, 2016 notice, these popular rifle models, which accept .223 Remington caliber ammunition, suddenly appeared to be legal to manufacture and sell in the Commonwealth because the August notice stated that "any .22 caliber rifle" did not constitute an assault weapon, nor were they copies or duplicates of the "enumerated assault weapons."  (*Id*, ¶46).

Within mere days, the "Guns That Are Not Assault Weapons" notice suddenly changed, without any reason provided, to state that only semiautomatic rifles chambered for .22 caliber <u>rimfire</u>[6] ammunition were not "assault weapons."  (*Id*, ¶47 and revised Notice as Exhibit I).  This unannounced change reversed course from the notice issued days earlier and reduced the number of firearms that could be lawfully sold.  (*Id*, ¶47).  The Attorney General's Office later changed course again, revising the "Guns That Are Not Assault Weapons" notice to add .17 caliber rimfire ammunition models as other firearms which are not banned "assault weapons."  (*Id,* ¶48).

These notices create other sources of confusion because there are a large number of models of .22 caliber rimfire semiautomatic rifles manufactured and sold by many manufacturers, including the Nordic NC-22LR, the CMMG MK4 T 22LR, a Smith and Wesson M&P 15-22, the DPMS Bull Barrel 22 LR and the DPMS AP4 22 LR.  (*Id,* ¶63).  Although these would be prohibited under the expanded definition of "copy" appearing in the Enforcement

---

[6] Rimfire ammunition refers to ammunition cartridges where the priming mixture is in the rim of the cartridge cavity, while "centerfire" ammunition houses the priming mixture in the center of the case head.  (*Id*, ¶18).

Notice, which bans copies of <u>any</u> caliber, the later issued "Guns That Are Not Assault Weapons" notice states that they are not banned.  (*Id*, ¶63).[7]

Further, the second notice entitled "Guns that Are Not Assault Weapons" also suddenly listed "[a]ny Springfield Armory M1A or substantially similar model weapon" as firearms which are not banned assault weapons.  (*Id*, ¶49).  The Springfield Armory M1A, which holds more than five rounds, evolved into the MK 14 EBR, which is essentially an M1A in an aluminum chassis.  (*Id*, ¶51).  The MK 14 EBR is in active use by the United States military special forces but according to the second "Guns That Are Not Assault Weapons" notice, it does not appear to be an assault weapon because it is "substantially similar" to an M1A.  (*Id*, ¶51).

Not only retailers are confused:  even the Attorney General's Office does not know how to interpret and apply the Enforcement Notice to specific firearms.  (*Id*, ¶66).  After the Office of the Attorney General issued the Enforcement Notice, Christine Noyes from Grrr! Gear, Inc. contacted the Attorney General's Office at the telephone number provided on the Office's announcement to receive guidance on whether certain Ruger firearms constituted prohibited "copies" of assault weapons and would be prohibited.  (*Id*, ¶66).  After speaking to the person at the office, the Attorney General's office informed her that they did not know the answer, and they did not have a list of what would be prohibited assault weapons.  (*Id*, ¶66).  Instead, the Office informed Ms. Noyes that her store should use "its best judgment" in deciding which firearms fell under the term "copies or duplicates."  (*Id*, ¶66).  Essentially, the chief law enforcement officer informed a member of the public that it should decide if it was committing a crime or not.  Representatives from Pullman Arms also contacted the Attorney General's office

---

[7] According to one version of the Question and Answers issued after the Enforcement Notice, the Enforcement Notice controls in the event of any discrepancies.  (Complaint, Ex. A. p. 1)

to ask questions concerning the scope of the Enforcement Notice, and they were also told to use their best judgment.  (*Id*, ¶67).[8]

The Attorney General is making up the law "on the fly" as she wishes it be.  She is not simply interpreting the statute the Legislature actually enacted.

## I.   PLAINTIFFS' COMPLAINT STATES VALID VAGUENESS CLAIMS, BOTH AS-APPLIED AND FACIAL

The Attorney General issued the Enforcement Notice out of the blue, a new regulation purporting to criminalize firearms sales retailers have sold legally for 22 years since the initial federal legislation.  But the regulation, in its failure to define the vague terms it uses, renders it impossible for retailers to know which firearms are prohibited.  The Due Process clause under the Fourteenth Amendment prohibits this type of incomprehensible regulation.

For Plaintiffs, the uncertainty has had an immediate, negative impact on their businesses. These four small businesses identify in the Amended Complaint specific firearms that they previously sold, but, fearing prosecution, stopped selling at a real cost because they now are unable to tell if the firearms are illegal under the vague regulation.  This epitomizes an as-applied challenge, a claim the Attorney General pretends in vain is not part of this case.  It is.

In addition to seeking facial relief, the retailers ask the Court in their Amended Complaint to declare the Enforcement Notice unconstitutionally vague "as applied to Plaintiffs' proposed offering for sale of" these specific firearms.  (Amended Complaint, Requests for Relief, ¶1).[9]  These as-applied and facial vagueness challenges are distinct, meritorious claims, and this Court should deny the motion to dismiss them.

---

[8] The Office still does not know how to apply its Notice to firearms including the IWI Tavor.  As recently as November 2, 2016, the Office responded to a question concerning application of the Enforcement Notice to the IWI Tavor that it had not yet taken a position on that firearm. (*Id*, ¶60).

[9] The Attorney General does not attack the statutory mechanism by which the Plaintiffs assert their claims, only the substance of the facial challenge. In any event, the Plaintiffs properly seek relief under the declaratory judgment

### A. Retailer Plaintiffs' Challenge Concerning Specific Firearms They Stopped Selling Is A Valid, As-Applied Claim

An "as-applied" claim  is just what it sounds like—a law is vague concerning Plaintiffs' specific conduct.  "A regulation is unconstitutionally vague as applied to plaintiffs if it fails to provide 'a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement...i.e. whether [plaintiffs] in fact had fair notice that the [regulation] proscribed their [proposed] conduct." *Draper v. Healey*, 98 F. Supp. 3d 77, 83 (D. Mass. 2015) (emphasis added), *aff'd* 827 F.3d 1 (1st Cir. 2016), *quoting Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010).

The Plaintiffs here state a quintessential as-applied challenge.  Uncertain whether the proposed sale of identified firearms violates the Enforcement Notice, they ask this Court to declare that the Attorney General cannot enforce the Notice against them as to these firearms. The Plaintiffs described how they previously sold but stopped selling certain rifles (IWI Tavor, Kel-Tec RFB, and FN PS90) because it is unclear whether the phrase "operating system and firing mechanism" refers to commonality of design details (*i.e.* they understand those firearms would be *legal*) or commonality of physics principles (*i.e.* they understand they would *not* be legal) (Amended Complaint ¶¶ 50–52, 54–57, 65, 68).  They previously sold but stopped selling .22 caliber firearms (.22 caliber rimfire AR-15-style and Smith and Wesson M&P 15-22 rifles) because, while the Attorney General later advised that .22 caliber rimfire rifles are permitted, the Enforcement Notice provided that *any* caliber firearms meeting the regulation's tests are prohibited.  The Complaint, alleging vagueness and seeking declarations concerning specific

---

statute, claiming that the Attorney General's actions violate their Fifth and Fourteenth Amendment due process rights.  See *Steffel v. Thompson* 415 U.S. 452 (1974) (federal declaratory relief is available for due process violations to attack a statute on its face or as applied, even when no criminal charge is pending).

firearms, sufficiently mounts an "as applied" challenge to the notice.  (*See* Amended Compl., ¶¶ 77-78, 81-83, 92-93, 95-98).

### B.   The Attorney General Ignores the Allegations and Requests for Relief Concerning Specific Firearms.

Despite acknowledging that Plaintiffs expressly challenge the Notice's applicability to specific firearms (*see* Deft.'s Memo, p. 28), the Attorney General ignores all of Plaintiffs' allegations and requests for relief on that issue.  Instead, she cherry-picks the Amended Complaint's requests for facial relief and argues, incorrectly, that the presence of facial claims means either that Plaintiffs do not or cannot bring as-applied claims.  This is incorrect, legally and factually.

The Attorney General cites *John Doe No. 1 v. Reed* 561 U.S. 186 (2010) for this argument, stating that this Court should look at the claim and the relief requested to determine whether the vagueness claim is a facial challenge.  While this approach is correct, she misapplies it.  In that case, the plaintiffs signed a political petition ("Referendum 71"), and sued to prevent that petition's public disclosure under a public record statute. 561 U.S. at 190-191.  The plaintiffs challenged the law's constitutionality, "as applied to the Referendum 71 petition" (as phrased in their complaint), and as applied to *all* political petitions.  *Id.* at 194.  The Supreme Court reviewed whether the count concerning *all petitions* constituted a facial challenge.  Notably, and the Attorney General ignores this, the Supreme Court acknowledged that the plaintiffs' claim concerning Referendum 71 was clearly as-applied and actionable because it did not extend beyond the "particular circumstances of the plaintiffs."  561 U.S. at 194.  Therefore, the Supreme Court clarified that plaintiffs can bring actionable as-applied claims separate and apart from facial challenges, and that a valid request for as-applied relief is not transformed into a facial claim simply because plaintiffs also separately seek facial relief.

The Attorney General misapplies the approach because, while she looks at the "claim and relief" concerning Plaintiffs' *facial* claim, she simply ignores the allegations and requested relief concerning Plaintiffs' *as-applied* claim that the Notice is unconstitutionally vague concerning specific firearms.  The Attorney General ignores that Plaintiffs' Amended Complaint expressly requests a declaration that the Notice "is unconstitutionally vague as applied to Plaintiffs' proposed offering for sale of" several specific firearms, and seeks an injunction against enforcement concerning those specific firearms.  (Amended Complaint, p. 23, ¶ 1).  Like the complaint in *John Doe*—which involved as-applied claims concerning Referendum 71 and facial claims concerning all petitions—Plaintiffs' Amended Complaint involves both as-applied and facial claims, and the mere presence of facial claims does not transform the as-applied claims into facial ones.  Plaintiffs' as-applied claims can proceed.

### C.  Pre-enforcement Claims Are Not Facial Challenges.

The Attorney General also argues, incorrectly, that because the Enforcement Notice has not yet been enforced, the due process challenge is facial.  This argument fundamentally misreads *Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 203 (1st Cir. 2002).  That case does not hold that as-applied claims are reserved for those actually charged with crimes, or worse yet, to those in handcuffs and holding cells.  Neither *Swift* nor any other case holds that the decision to seek pre-enforcement relief instead of risking criminal prosecution transforms an as-applied challenge into a facial one.

Instead, the *Swift* Court's discussion of pre-enforcement relief is in the context of ripeness, and does not at all concern the difference between facial and as-applied claims.  Nor would it, as the vagueness claim in *Swift* was clearly a facial one not tethered to the plaintiffs' specific conduct: "[t]he plaintiffs claim that these vague definitions leave thousands of gun

owners in Massachusetts unable to determine whether they need to license their guns as large capacity weapons." *Id.* at 203.  Under the *Holder* and *John Doe* tests, the claim in *Swift* is facial based on the allegations and relief sought; the pre-enforcement nature of the claim is irrelevant.

The Attorney General's invocation of pre-enforcement relief is really an unarticulated ripeness argument, likely unarticulated for its futility.  As even the *Swift* case notes, "threats of enforcement of a vague statute can support a challenge to a statute," and "[o]ne does not have to await the consummation of threatened injury to obtain preventative relief."  *Swift*, 284 F.3d at 206.  A case is ripe for adjudication and standing exists when "threatened prosecution puts the party seeking pre-enforcement review between a rock and a hard place—absent the availability of pre-enforcement review, she must either forego possibly lawful activity because of her well-founded fear of prosecution,[10] or willfully violate the statute, thereby subjecting herself to criminal prosecution and punishment."  *Id.* (internal quotation omitted).  *See, e.g., Draper*, 98 F. Supp. 3d at 80–81 (firearm retailers have standing to challenge, pre-enforcement, a prohibition against selling certain firearms); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (allowing "preenforcement review of a criminal statute" where "Plaintiffs face 'a credible threat of prosecution' and 'should not be required to await and undergo a criminal prosecution as the sole means of seaking relief'").

That is exactly the case here.  Defendant has thoroughly publicized her intent to prosecute any and all violations of her pointedly-named "Enforcement Notice" (Amended Compl., ¶ 69).  She issued a press release that "her office is stepping up enforcement" with what she calls a "crackdown" on "copycat" firearms.  (Amended Compl., Ex. J).  In a prepared statement, she told the press, "we're cracking down on" prosecutions under the Enforcement

---

[10] The Attorney General, without any citation, suggests that the standard is not "well-founded fear" but "imminent[]" enforcement.  (*See* Deft.'s Memo, p. 28).  As shown in *Swift*, this is not the standard.

Notice.  (Amended Compl., Ex. L).  Her intentions could not be clearer or more credible: comply with my vague notice or you will be prosecuted.[11]

Accordingly, these retailers have chosen to "forgo possibly lawful activity"—selling IWI Tavor bullpup rifles, Kel-Tech RFB rifles, FN PS90 rifles, .22 caliber rimfire AR-15-style rifles, Springfield Armory M1A rifles, and .22 caliber Smith and Wesson M&P 15-22 rifles—instead of gambling their businesses, families, and freedom on a vague regulation.  The choice the Attorney General imposes on retailers is particularly difficult here, having already told one of the retailer plaintiffs upon inquiry that "[t]he AGO has not taken a position on the sale of the [IWI] Tavor at this time" acknowledging the Enforcement Notice's vagueness as applied to that firearm, while expecting the plaintiff to be the one to risk imprisonment over it.  (Amended Complaint, ¶60).

Strip away the misdirection, and the Defendant is essentially correct: an as-applied claim is one concerning a law "as applied to particular plaintiffs" and seeking relief that does not "reach beyond the particular circumstances of th[e] plaintiffs."  (Deft.'s Memo., p. 29, *quoting John Doe No. 1*, 561 U.S. at 194).  That is the essence of the Plaintiffs claims concerning IWI Tavor, Kel-Tec and FN PS90 rifles, .22 caliber rimfire AR-15-style rifles and .22 caliber Smith and Wesson M&P 15-22 rifles.  These allegations constitute an as-applied claim and should not be dismissed.

---

[11] As an aside, the Attorney General cites a First Circuit case, out of context, for the proposition that an as-applied challenge "must, logically, be aimed at past [police] conduct; we cannot speculate as to future enforcement patterns."  (Deft.'s Memo, p. 28, *quoting McGuire v. Reilly*, 386 F.3d 45, 64 (1st Cir. 2004)).  That case was discussing the specific and distinct as-applied theory of "discriminatory enforcement," in which an otherwise constitutional law is rendered unconstitutional by its selective enforcement, and the quoted language concerned the plaintiffs' failure in that case to cite any evidence that a statute was in fact being selectively enforced.  That case does <u>not</u>, as Defendant implies, suggest that past enforcement history is necessary to establish pre-enforcement standing, a wholly discrete and separate issue.

### D.  Retailer Plaintiffs' Facial Challenge Also is Cognizable and Meritorious

Defendant makes two principal arguments regarding Plaintiffs' facial challenge, both of them incorrect.  First, the Attorney General seems to argue that facial vagueness claims are cognizable only under the First Amendment.  Second, the Attorney General misstates the test when she argues that a facial vagueness claim requires "that the law is impermissibly vague in all of its applications," a test the Supreme Court expressly rejected in 2015.

### 1.  Facial Vagueness claims outside the First Amendment are valid claims.

Facial vagueness claims can be brought outside of the First Amendment context when the regulation does not clearly prohibit a plaintiff's conduct.  In *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* a case the Attorney General cites,[12] a store brought a facial challenge to a vague law prohibiting the sale of certain drug paraphernalia.  The Supreme Court there found that the ordinance did not implicate First Amendment rights, and then considered the plaintiff's facial vagueness challenge, which repudiates the Attorney General's apparent argument that only First Amendment facial challenges can be brought.  455 U.S. 489, 496–99 (1982) ("A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test *may nevertheless be challenged on its face as unduly vague, in violation of due process.*") (emphasis applied).   That plaintiffs with as-applied challenges can bring facial claims outside the First

---

[12] The Attorney General's recitation of the law omits half the rule—facial claims are not cognizable outside the First Amendment <u>if the plaintiff "engages in some conduct that is clearly proscribed."</u>  *United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013) (*quoting Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010)) (emphasis added).  Indeed, the *Hoffman* language Plaintiffs cite is a footnote to the following critical sentence: "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).  This crucial factor, the clear criminality of the plaintiffs' conduct, is present in the cases the Attorney General cites.  *See, e.g., Zhen Zhou Wu*, 711 F.3d at 14-15 (no facial challenge only after rejecting as-applied challenge); *Chapman v. U.S.*, 500 U.S. 453 (1991) (declining facial vagueness challenge of drug sentencing law by criminal defendants who sold LSD).  This is not the case here, where Plaintiffs' as-applied challenge is meritorious, and when the Attorney General's Office has informed one of the Plaintiffs that it does not know whether the Enforcement Notice prohibits the IWI Tavor, one of the firearms Plaintiffs wants to sell, months after the notice became effective.

Amendment has been affirmed time and again.  *See, Donovan v. City of Haverhill*, 311 F.3d 74 (1st Cir. 2002) (facial challenge to ordinance governing moving of buildings); *Whiting v. Town of Westerly*, 942 F.2d 18 (1st Cir. 1991) (facial challenge to public sleeping ordinances).  Where Plaintiffs' conduct is not clearly prohibited, and they mount a colorable as-applied challenge, their facial claim also is colorable.

### 2.   The Enforcement Notice's similarity test is facially vague.

The Attorney General also misstates the law when she argues that a facial vagueness claim requires the law to be "impermissibly vague in all of its applications," as if a few isolated examples of non-vague applications will save an otherwise vague law.  The Supreme Court expressly rejected this test in 2015.  *Johnson v. U.S.*, 135 S.Ct. 2551, 2560–61 (2015).  The Court in *Johnson* found a law to be facially vague, despite some clearly non-vague applications, reasoning that "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provisions grasp."  *Id.* (and examples cited) (emphasis in original).  As a result, the issue here is not whether some hypothetical firearm could clearly be banned by the similarity test (like the Attorney General's invocation of a few isolated hypothetical examples).[13]  The issue is whether the Enforcement Notice fails to adequately define what is prohibited, and the Enforcement Notice does.

Plaintiffs' facial challenge is that the Notice's similarity test, lacking definitions, allows two interpretations with vastly different outcomes for firearms that are not otherwise prohibited by the interchangeability test.  (Amended Complaint, ¶¶52–56).  It is unclear whether the test, focusing on "operating systems and firing mechanism[s]," targets physics principles or design

---

[13] At a minimum, the scope of the Notice and its reach involve complex factual issues and require factual development.  Dismissal at this stage is not appropriate.

details.  This uncertainty provides retailers with no metric to determine whether firearms, not otherwise "copies" under the interchangeability test, are "copies" under the similarity test.

Preliminarily, the Attorney General argues that it has not specifically advanced a "physics principles" interpretation. (Deft.'s Memo, p. 32).  But she has not repudiated that interpretation either, nor advanced the "design details" interpretation.  The Enforcement Notice's uncertain language is equally capable of either interpretation, and the Enforcement Notice's vague language simply does not indicate to retailers which to apply.

This epitomizes facial vagueness.  "[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *Zhen Zhou Wu*, 711 F.3d at 14 (*quoting F.C.C. v. Fox Television Stations, Inc.*, 132 S.Ct. at 2307, 2317 (2012).  "[W]hat fact must be proved" to establish criminality under the similarity test is precisely the unanswered question for Commonwealth businesses—does the Commonwealth need to prove similarity based on physics principles or design details?  The answer, untold in the Notice, renders a sale either lawful or punishable by up to 10 years for a first offense.  G.L. c. 140, § 131M.  The Notice, lacking objective clarity and permitting discriminatory enforcement concerning "what fact must be proved," therefore has no "legitimate sweep" and is unconstitutional.  *See also Johnson*, 135 S.Ct. at 2556 (law is constitutional if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement").

As the Attorney General acknowledges, a law is unconstitutionally vague on its face if it lacks a "legitimate sweep."  But she makes no argument at all to prove such a "legitimate sweep," except for conclusory pleas that the Notice has one.  (*See* Deft.'s Memo., p. 30–31).  Unsupported statements aside, the test lacks standards to allow retailers to conform their conduct

to the regulation.   "A criminal law…must not permit policemen, prosecutors, and juries to conduct a standardless sweep ... to pursue their personal predilections."  *City of Chicago v. Morales*, 527 U.S. 41, 65 (1999) (O, Connor, J., concurring).  Here, the test's lack of clarity permits a "standardless sweep," granting the Attorney General, police, and juries free license to target retailers based on whims, be they personal or political, depending on outside factors having nothing to do with proper interpretation of the Notice.

The similarity test's "standardless sweep" is all the more dangerous for business owners where the Attorney General, after issuing the Notice, opined that a number of firearms are "not assault weapons," though these firearms could fail the similarity test to a local officer who chooses to enforce the physics principles interpretation.  Specifically, the Attorney General has suggested that she would not prosecute sellers of a number of semiautomatic firearms - .22 caliber rimfire rifles, the Ruger Mini 14, and Springfield Armory M1A.  This does not solve the Plaintiffs' dilemma.  While the Attorney General is the Commonwealth's chief law enforcement officer, she is not the only one.  District Attorneys, the state police and local police can all interpret the law Notice as they see fit.  As a result, these firearms share similar physics principles with enumerated assault weapons, and could subject the Plaintiffs to prosecution under the whim of local law enforcement and prosecutors.

The Court should not dismiss the claims that the Enforcement Notice is unconstitutional on its face and as applied at this stage of the proceeding.

## II.    THE 11TH AMENDMENT DOES NOT BAR THE STATE LAW CLAIMS.

The Attorney General argues that the 11th Amendment bars Plaintiffs' state law claims.

However, the Attorney General's interpretation of *Pennhurst State School & Hosp. v.*

*Halderman*, 465 U.S. 89 (1984) is too broad.  In fact, Plaintiffs may maintain their case against

the Attorney General because (a) the Attorney General's actions exceed her authority, and these

state law claims are not protected from federal jurisdiction under *Pennhurst*; and (b) the Notice

impacts a property interest that is protected by the Due Process Clause of the Fourteenth

Amendment and is not based solely on violations of state law.

### A.  The Enforcement Notice Violates the Massachusetts Assault Weapons Ban.

The Massachusetts legislature already has spoken: it specifically rejected the nearly

identical language in the Enforcement Notice when it amended Massachusetts law to incorporate

the federal assault weapon ban.  When the Legislature enacted the licensing statute amendments

contained in G.L. c. 140 §§122 and 123 *et seq.*, it considered Senate Bill No. 1985.  That

proposal sought to define "assault weapon" with thirteen categories of specific firearms and

"copies" of those firearms by including a definition of "copy" based on similar bolt and receiver

designs.  Senate Bill No. 1985 defined the term "copy" to include:

> any weapon model with the same bolt and receiver or bolt and
> receiver design, regardless of nomenclature or manufacturer, as
> any weapon designated as an "assault weapon" in this section or
> **with a bolt and receiver design identical or nearly identical,**
> regardless of nomenclature or manufacturer, to any designated
> weapon which has been redesigned from, renamed, renumbered or
> patterned after any such designated weapon, regardless of the
> manufacturer or country of origin; provided, however, that the
> weapon as modified, enhanced, redesigned, renamed, renumbered,
> or patterned employs only ammunition of more than .22 caliber
> rimfire.

<u>See</u> Copy of Senate Bill No.1985 attached to complaint as Exhibit F. (emphasis added)

The Massachusetts Legislature considered and rejected the proposed "copy" definition which referred to identical or nearly identical bolt and receiver designs.  Instead, the Legislature amended G.L. c. 140 to provide that the term "assault weapon" shall have the same meaning as a semiautomatic weapon defined in 18 U.S.C. §921(a)(30), by including the list of enumerated firearms from 18 U.S.C. §921(a)(30) such as AK models, Israeli made UZIs, and Colt AR-15's, and copies or duplicates of the enumerated weapons, without any reference to identical or nearly identical receivers and bolts.

The Legislature's consideration and rejection of the proposed "copy" definition demonstrates that it did not intend G.L. c. 140 to include that definition.  The Legislature did not do so, and this untethered definition cannot now be added in by the Attorney General.  "Few principles of statutory construction are more compelling than the proposition that [the legislature] does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."  *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 392–393 (1980) (Stewart, J., dissenting); *cf. Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 200 (1974); *Goncalves v. Reno*, 144 F.3d 110, 133 (1st Cir. 1998).  Under this principle, the rejection of an amendment indicates that the Legislature did not intend the bill to include the provisions in the rejected amendment.  *Immigration & Naturalization Servs. v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987); *United States v. Pfitsch*, 256 U.S. 547, 551-52 (1921).

### B.  The Attorney General Does Not Have the Authority to Rewrite a Licensing Statute with Criminal Penalties Attached.

The Attorney General argues, correctly, that she has "wide discretion in determining whether to prosecute an individual" under any given criminal statute.  *Comm. v. Clint C.*, 430 Mass. 219, 228 (1999).  What she does not have the authority to do, however, is rewrite a

criminal statute to encompass markedly broader conduct than the Legislature adopted, or than the plain language of the statute supports.

The Massachusetts Constitution emphasizes the separation of powers in the Commonwealth.  Chapter 1, Section 1 of the Massachusetts Constitution establishes law-making authority in the Legislature alone.  While the Attorney General has broad common law authority to control litigation in the Commonwealth, *Secretary of Administration and Finance v. Attorney General*, 367 Mass. 154, (1975), that authority is not without limits.  No case has been found that this authority includes legislating, nor is that power conferred upon the Attorney General under her enabling legislation in G.L. c. 12.  This limitation on the Attorney General's authority is important and has been recognized.  The Massachusetts Supreme Judicial Court has held: "[t]he Attorney General is not free to make a distinction which the Legislature has not made.  It is for the Legislature, not the executive branch, to determine legislative policy.  The Attorney General must be faithful to the words of a statute as written, and an event or contingency for which no provision has been made does not justify judicial [or Attorney General] legislation." *Town of Amherst v. Attorney General*, 398 Mass. 793, 798-99 (1986) (internal quotations and citations omitted).

But this is exactly what the Attorney General has done. She has vastly expanded the scope of a criminal statute through the Enforcement Notice.  While she argues that she is merely issuing some sort of interpretative advisory, the Attorney General issued a Notice that is not an interpretation of the law.  It rewrites the law in a way that renders previously legal conduct, reported to and approved by law enforcement authorities for each and every firearm sale for the last 22 years, suddenly illegal. That is not the exercise of prosecutorial discretion; it is law-

making, and exceeds the Attorney General's authority under the common law and under G.L. c. 12.

Impermissibly expanding the scope of a statute is also prohibited under the doctrine of lenity.  In *Crandon v. United States,* 494 U.S. 152 (1990), Justice Scalia observed that "we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference." *Id.* at 177.  Commenting on the United States Attorney General's overly broad interpretation of a federal statute, Justice Scalia wrote that deference to that interpretation would "turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity." *Id.* at 178.   Under the rule of lenity, significant ambiguity in a penal statute is resolved in the defendant's favor.  *See United States v. Lanier,* 520 U.S. 259, 266 (1997).

Because the Attorney General's Enforcement Notice is in conflict with the plain language of G.L. c. 140, the Plaintiffs will request that the Court issue a permanent injunction enjoining the Office of the Attorney General from enforcing the Enforcement Notice and its definition of copy or duplicate of Enumerated Weapons.

### C.  Pennhurst Does Not Warrant Dismissal of the Claim.

#### 1.  The claims are based on a property interest protected by the Due Process Clause of the Fourteenth Amendment.

*Pennhurst* immunity does not bar claims which are based on the Constitution and 42 U.S.C. §1983.  The claim that the Attorney General exceeded her authority also implicates Plaintiffs' property interests, which are protected by the Due Process Clause of the Fourteenth Amendment.  State law can create liberty and property rights either explicitly or by creating an expectation that gives rise to a vested right.  *See, e.g., Paul v. Davis*, 424 U.S. 693 (1976); *Board of Regents v. Roth*, 408 U.S. 564 (1972).  Courts have found that persons enjoy a property

25

interest in firearms licenses to which due process protections apply. *Hightower v. City of Boston*, 693 F.3d 61, 83-84 (1st Cir. 2012) (Court cited with approval its earlier opinion that the right to bear arms is a right which cannot now be withdrawn without due process); *see also*, *Spinelli v. City of New York*, 579 F.3d 160 (2d Cir. 2009) (Lower court erred in finding that gun dealer did not have a property interest in her license protected by the Due Process clause.)

As stated in the Complaint, the four retailers are all licensed under G.L. c. 140 to sell firearms.  The Enforcement Notice affects Plaintiffs' property rights by removing their ability to sell certain guns that they have been lawfully selling under the terms of their state issued licenses.  "Due process requirements are implicated when licensing decisions affect a property interest." *Roslindale Motor Sales v. Police Commissioner of Boston*, 405 Mass. 79, 82 (1989). When the Attorney General acted outside of her authority to implement the Enforcement Notice, her conduct implicates due process rights which are not based solely on state law.  Because the claim is also based on the due process concerns, Plaintiffs' claims about her conduct are not barred by the *Pennhurst* doctrine.  *See e.g. Libby v. Marshall*, 653 F. Supp. 359 (D. Mass. 1986) (When plaintiff's causes of action are based on the Constitution, *Pennhurst* does not bar the claims.)

### 2.   When the Attorney General acts *ultra vires*, the Plaintiffs may maintain the action in Federal Court to challenge her conduct.

Even if the claims that the Attorney General exceeded her authority rely on state law, the Plaintiffs may maintain these claims.  While a State is immune from federal suit from certain state law claims under *Pennhurst*, the holding of that case is not so broad as to preclude pendent state law claims in federal court against state officers acting in excess of their authority.  In *Pennhurst*, the Court interpreted sovereign immunity law to preclude injunctive relief "against State officials for failing to carry out their duties under State statutes" or on "violations of state

statutes that command purely discretionary duties." *Pennhurst*, 465 U.S. at 109-10.  The Court

did not hold that a state officer, acting outside her authority in violation of state law, cannot be

subject to federal jurisdiction.

*Pennhurst* did not overrule the line of cases running from *Ex parte Young,* 209 U.S. 123

(1908) through *Florida Dept. of State v. Treasure Salvors, Inc.,* 458 U.S. 670 (1982), that held

that a state official acting outside her authority can be subject to federal jurisdiction.  Rather,

*Pennhurst* sidestepped this issue, as the state authorities in that case were "clearly acting within

the scope of their authority." *Pennhurst*, 465 U.S. at 107.  In *Treasure Salvors*, the Supreme

Court held that "[i]f conduct of a state officer taken pursuant to an unconstitutional state statute

is deemed to be unauthorized and may be challenged in federal court, conduct undertaken

without any authority whatever is also not entitled to Eleventh Amendment immunity."

*Treasure Salvors*, 458 U.S. at 698-97.  This ruling survives *Pennhurst*, and the Plaintiffs are not

aware of First Circuit case law holding otherwise.

While the Attorney General cites *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71

(1989) for the proposition that a "suit against a state official is no different from a suit against the

State itself," that case was limited to the question of whether a State and state officials acting in

their official capacity were "persons" under federal civil rights statutes.  It did not address the

situation of whether pendent state law claims against a state official acting outside her authority

could be brought in federal court.

Further, the Attorney General's reliance on *O'Brien v. MBTA,* 162 F.3d 40, 44 (1st Cir.

1998) is misplaced.  In that case, the First Circuit declined to "supervise state officials'

compliance with state law" in a situation where the state officials were exercising their

discretion, not a situation where those officials were acting outside their authority.  In *O'Brien*,

plaintiffs challenged MBTA officials' decision to apply for federal transportation funds, which caused MBTA employees to be subjected to drug tests.  However, the First Circuit noted that it was the MBTA's choice to "either accept federal funds (and subject themselves to requirements imposed by federal law) or decline such funds (and avoid the necessity of abiding by those requirements)."  *Id.* at 43.  This choice was a proper act of discretion by the MBTA officials, and thus subject to *Pennhurst*.  Similarly, *Lopez v. Massachusetts*, 588 F.3d 69, 73 n. 1 (1st Cir. 2009) does not address a situation where the state actor is acting *ultra vires*, and is thus exempt from the *Pennhurst* doctrine.

The Attorney General purports, through the Enforcement Notice, to be executing the purpose of G.L. c. 140.  This decision exceeds her authority as the chief law enforcement officer of the Commonwealth and runs counter to the Massachusetts Assault Weapons Ban.  As a result, *Pennhurst* does not bar Plaintiffs from bringing pendent state law claims in this forum.

The Attorney General's sweeping reading of *Pennhurst* also runs counter to Massachusetts's strong interest in upholding its own laws, because it would prevent federal courts from enjoining state officers who act illegally.  A state may have an interest in federal courts refraining from second-guessing officials' authorized acts, but it does not have a basis to object to federal review of state officers who are clearly acting outside their authority in violation of state law.

### 3.  Plaintiffs do not claim the Enforcement Notice is an arbitrary regulation.

The Attorney General misreads language in Plaintiffs' Complaint about the arbitrary and capricious nature of the issuance of the Enforcement Notice as setting forth a claim under the Massachusetts Administrative Procedures Act, G.L. c. 30A, § 14(7).  In fact, Plaintiffs make no such claim.  Rather, Plaintiffs describe the Attorney General's sudden, unilateral change in tack

in her enforcement of G.L. c. 140 as the definition of arbitrary and capricious government action. These terms accurately describe the Attorney General's process, which ignores nearly two decades' worth of practice under the law and threatens to upend the lawful sale of firearms in Massachusetts in its entirety.  While Plaintiffs firmly disagree that the Enforcement Notice was "an example of fairness and transparency," as it is so vague as applied as to be incomprehensible, they do not set forth a claim under the Administrate Procedures Act here.

### III.   THE ENFORCEMENT NOTICE UNCONSTITUTIONALLY BURDENS THE SECOND AMENDMENT.

If the Court, after resolving Plaintiffs' vagueness claims, reaches the Second Amendment claim,[14] it should hold that the Enforcement Notice, under any level of review, unconstitutionally bans semiautomatic firearms commonly used for protection of home and family. Though Courts must apply heightened review without first assessing the extent of the burden on the constitutional right, the Notice's burden on core Second Amendment rights is not *de minimis* and fails constitutional muster.

### A.  Plaintiffs Have Standing To Bring Their Second Amendment Claim.

Preliminarily, the Court need only reach Plaintiffs' Second Amendment claim if the Court, in resolving Plaintiffs' vagueness claim, finds that the Enforcement Notice's similarity test targets physics principles.  In that case, the Enforcement Notice would essentially prohibit all semiautomatic rifles and shotguns not otherwise specifically exempted under the licensing statute.  This is no different from alternative pleading, in which one claim is premised on the outcome of another, which is expressly permitted by Fed. R. Civ. P. 8(d).

---

[14] Though not argued by the Attorney General, firearms retailers have standing to bring Second Amendment claims. *See Teixeira v. Cty. of Alameda*, 822 F.3d 1047, 1055–56 (9th Cir. 2016) ("the right to purchase and to sell firearms is part and parcel of the historically recognized right to keep and to bear arms"; "[O]perating a business that provides Second Amendment services is generally protected by the Second Amendment, and prohibitions on firearms sales are subject to similar scrutiny") (quotation omitted); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) ("supplier of firing-range facilities[]is harmed by the firing-range ban and is also permitted to act[ ] as [an] advocate[ ] of the rights of third parties who seek access to its services") (quotation omitted).

The Attorney General misunderstands this procedural point when she argues, incorrectly, that the Second Amendment claim is unripe due to its reliance on the outcome of the vagueness claim. She cites irrelevant case law involving "possible future injury," where the alleged injury had not yet occurred but could occur in the future. *See e.g. Clapper v. Amnesty Intern'l USA*, 133 S.Ct. 1138, 1147 (2013) (alleging injury based on possible future surveillance of plaintiffs). Those cases are irrelevant, because Plaintiffs' Second Amendment claim is not premised on possible *future events*, but rather on one possible legal interpretation this Court could reach, which would govern what the Enforcement Notice has meant since it was unexpectedly issued in July 2016. That is, if the Court rules that the Enforcement Notice's similarity test targets physics principles, then the Enforcement Notice has infringed on the Second Amendment since its issuance, meaning that the injury began long ago and continues.

Plaintiffs' Second Amendment claim, based on the outcome of another claim rather than future events, is simple alternative pleading that is ripe for adjudication.

### B. Strict Scrutiny Should Apply to the Enforcement Notice.

The Second Amendment protects citizens' fundamental right to bear arms in the home for self-defense, and at the very least, preempts laws that effectively prohibit "an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) (Second Amendment applies to states). *Heller* requires heightened scrutiny of such laws. *See id.*, at 628 n.27 (rejecting rational-basis scrutiny). The Court held that such a law (there, a prohibition on assembled handguns in the home) "would fail constitutional muster" under any standard of scrutiny applicable to "enumerated constitutional rights." *Id.*

Lower courts have varied on the applicable level of scrutiny to apply to laws impinging the core Second Amendment right of lawful, responsible citizens to bear arms for self-defense in the home.  None has applied mere rational basis review. The First Circuit has yet to decide this issue, but applies intermediate scrutiny review to laws impinging the lesser rights of violent criminals. *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011) (requiring "strong showing" of a "substantial relationship between the restriction and an important governmental objective"); *compare Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 9 (1st Cir. 2012). This suggests that the First Circuit, like other courts, would apply strict scrutiny to laws impinging core rights of lawful, responsible citizens.  *See, e.g., U.S. v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010) (intermediate scrutiny for felon's rights, with strict scrutiny reserved for rights of "law-abiding, responsible citizen[s]").

The Attorney General suggests that the Court need not apply *any standard*, relying on cases where courts deigned to proclaim burdens "*de minimis*" rather than "substantial," and thus ineligible for review.  But Justice Scalia, author of *Heller*, joined an opinion admonishing these courts' approach, observing that these courts "have failed to protect" the "Second Amendment's core protection for the right of self-defense." *Jackson v. City and County of San Francisco*, 135 S.Ct. 2799 (2015) (Thomas, J., dissenting from denial of certiorari, joined by Scalia, J.). The Justices "reiterate[d] that courts may not engage in this sort of judicial assessment as to the severity of a burden imposed on core Second Amendment rights." *Id.* at 2802. "The very enumeration of the right takes out of the hands of government - even the Third Branch of Government—the power to decide on a case-by-case basis what is *really worth* insisting upon." *Id.* (*quoting Heller*, 554 U.S. at 635)(emphasis in original).

Accordingly, a law infringing on the core Second Amendment of responsible citizens to bear arms for protection of self and home should be subject to strict scrutiny, without any evaluation of whether or not a specific burden is in the court's opinion "substantial." A total ban on semiautomatic arms "overwhelmingly chosen by American society for that lawful purpose" is a ban in the home for self-defense, so strict scrutiny applies to the Notice.

### C.   The Enforcement Notice's Prohibition Of Essentially All Semiautomatic Rifles And Shotguns Holding More Than Five Rounds Is Not *De Minimis*

Justice Scalia roundly rejected, as violating the Second Amendment, the Attorney General's suggested approach - that it is up to this Court to decide "the severity of [the] burden [the Enforcement Notice] impose[s] on core Second Amendment rights." *Jackson*, 135 S. Ct. at 2802. Accordingly, it is not this Court's role to decide, as the Attorney General pleads, whether the Enforcement Notice's infringements are "*de minimis.*" In any event, its burdens are not. Indeed, in the same breath that the Attorney General says the Notice targets a "narrow class of weapons that are 'copies or duplicates' of the Enumerated Weapons," she says Commonwealth citizens bought 10,000 of these firearms last year alone. (*See* Attorney General's press release, Compl. Ex. J; Ms. Healey's op-ed, Compl. Ex. K; Ms. Healey's remarks, Compl. Ex. L).

If the similarity test is broadly interpreted, its sweep of all semiautomatic rifles and shotguns the statute does not specifically exempt is an extraordinary prohibition. The statute exempts only semiautomatic rifles and shotguns: (1) that hold five or less rounds of ammunition, (2) that were possessed continuously for more than 22 years old (*i.e.* those "lawfully possessed on September 13, 1994"), and (3) those listed on a 22-year-old roster, on which several of the listed semiautomatic firearms have long been discontinued.[15] Effectively prohibiting all semiautomatic rifles and shotguns that hold more than five rounds of ammunition, the Notice

---

[15] As the Attorney General notes, the permitted semiautomatic firearms on this Appendix A to 18 U.S.C. § 922 are those listed as "autoloaders." Several of these firearms have long been discontinued.

unconstitutionally bans "an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Heller*, 554 U.S. at 628. The Attorney General's claim that 10,000 of these firearms were sold last year alone (*see* Compl. Ex. J–L) confirms these firearms' popularity for self-defense among law-abiding, responsible Massachusetts citizens.[16]

In any event, the Court cannot dismiss this claim at this stage, when the scope of the Notice and its effects are unclear.  The Court will need a factual record to weigh the Attorney General's approach, banning essentially semiautomatic firearms capable of holding more than five rounds, to determine if this is narrowly tailored to prevent the evil sought to be addressed.

The Court has before it no factual record on the history of semiautomatic rifles and shotguns as they are owned and used in Massachusetts for sport and self-defense.  There is no factual record on the purported relationship between semiautomatic firearms and mass violence. There is no record concerning the number of rounds in such firearms, nor the time it takes to reload them. There is no factual record at all, and this claim weighs important factual issues that require briefing, rendering dismissal premature. Where Plaintiffs allege that semiautomatic rifles and shotguns capable of holding more than five rounds are commonly owned and used for self-defense purposes, their Second Amendment claim should not be dismissed.

---

[16] Additionally, the Attorney General suggests that the availability of semiautomatic pistols renders the availability of semiautomatic rifles or shotguns *de minimis*.  This argument avoids *Heller's* holding that the Second Amendment protects the availability of arms commonly "chosen by American society for that lawful purpose" of self-defense, and that semiautomatic rifles and shotguns are certainly commonly used for that purpose.  *Heller*, 554 U.S. at 628. *See also id. at* 629 ("It is no answer to say, as [the government does], that it is permissible to ban the possession of [one class of firearms] so long as the possession of other firearms[] is allowed," when the banned firearm is commonly chosen for lawful self-defense").   Especially for the large number of lawful hunters in this commonwealth, who purchase rifles for both hunting and defense, the Attorney General's position paradoxically would increase the number of firearms owned in the Commonwealth, as hunters who cannot now obtain rifles sufficient for home defense would need to purchase semiautomatic pistols for that purpose.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court deny the

Defendant's Motion for Summary Judgment.

PLAINTIFFS,

Pullman Arms Inc., Guns and Gear, LLC,
Paper City Firearms, LLC, Grrr! Gear, Inc.,
and National Shooting Sports Foundation,
Inc.
By their attorneys,

     /s/  David R. Kerrigan
Christopher A. Kenney, Esq., BBO# 556511
cakenney@KandSlegal.com
David R. Kerrigan, Esq., BBO# 550843
drkerrigan@KandSlegal.com
Kenney & Sams, P.C.
Old City Hall
45 School Street
Boston, MA 02108
(617)722-6045

     /s/   Michael J. Sullivan
Michael J. Sullivan, Esq.
msullivan@ashcroftlawfirm.com
Ashcroft Law Firm
200 State Street
7th Floor
Boston, MA 02109

DATED: January 24, 2017

## CERTIFICATE OF SERVICE

I hereby certify, on behalf of Plaintiffs, that on January 24, 2017, I electronically filed the
foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of
electronic filing to all counsel of record.

/s/ David R. Kerrigan
David R. Kerrigan